**2020 IL 123849**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 123849)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
RICKEY ROBINSON, Appellant.

*Opinion filed June 18, 2020.*

JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Kilbride and Theis concurred in the judgment and opinion.

Justice Michael J. Burke dissented, with opinion, joined by Justices Garman and Karmeier.

**OPINION**

¶ 1 Petitioner, Rickey Robinson, appeals from an order of the circuit court of Cook County denying him leave to file a successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). The *pro se*

petition alleged a claim of actual innocence based on newly discovered evidence. The appellate court affirmed the decision of the circuit court in an unpublished order. 2018 IL App (1st) 153547-U. For the reasons that follow, we reverse the judgment of the appellate court.

¶ 2                                    I. BACKGROUND

¶ 3        Petitioner was charged with numerous offenses in relation to the December 1997 death of Nicole Giles. Two codefendants, Marques Northcutt and Peter Andrew Ganaway, were also charged and tried for their involvement in Giles's murder.

¶ 4                                  A. Trial Proceedings

¶ 5        At trial, the State presented autopsy evidence establishing that Giles died of a gunshot wound in her neck and that her body was subsequently burned. The State also presented the testimony of several witnesses.

¶ 6        Sherrilyn Bivens, Giles's mother, testified that Giles was supposed to pick her up from work at 6 p.m. on December 28, 1997. When she failed to show up, Bivens called Elsie Reed, Giles's friend, to ask whether she had heard from her daughter. Reed told Bivens that Giles had spoken with petitioner, who asked her to stop by. Bivens later went to the home of petitioner, who stated that, although he had spoken with Giles about coming to his house, she never arrived.

¶ 7        Elsie Reed testified that on December 28, 1997, she had participated in a three-way telephone conversation with Giles and petitioner. During that call, petitioner asked Giles to stop at his home before she went to Reed's house. When Giles failed to arrive at her house, Reed called petitioner to ask if he had seen her, and petitioner responded that she had not shown up.

¶ 8        Anjanette Vance and Lavell Rogers testified that on the evening of December 28, 1997, they were in a car stopped at the intersection of 88th and Kingston Streets, facing toward a viaduct. They observed two people standing over a person who was sitting on the ground against a car when a third person exited the vehicle and shot the person on the ground. The couple also saw a bag being placed over the head of

the victim and the body being pulled into the back seat of the car. They then flagged down a nearby police car and informed the officers of what they had observed. The couple returned to the scene with the police officers and saw blood on the street.

¶ 9        Leonard Tucker testified that, on December 28, 1997, he was the boyfriend of petitioner's sister and was at her house when petitioner, Northcutt, and Ganaway had a conversation about Giles, whom he had known for about seven years. When he and petitioner were alone, petitioner stated that he had killed Giles and that he had jumped out of the car and shot her in the head. After petitioner stated that he did not wear gloves, Tucker responded that his fingerprints would be on Giles's body and the car. Petitioner also indicated that they had put a bag over Giles's head, put her in the car, drove off, and then put her body in a garbage can. Tucker further testified that, as he left petitioner's house, Ganaway handed him a green Pronto pager, which he took home. Later that evening, Ganaway came to his home and gave him a green box of AK-47 bullets to hide, which he knew was illegal. The following day, he returned to petitioner's home and saw him with a red gasoline can. At that time, petitioner said "we burned her body." Tucker further testified that, on January 7, 1998, the police arrived at his school and escorted him to the police station, where he was informed that he was a suspect. He then told the police about the pager, the box of ammunition, and the conversations he had with petitioner and the others.

¶ 10        Maisha Muhammad testified that she was the best friend of petitioner's sister. At about 10:30 on the morning of December 29, 1997, she received a call from petitioner's sister, who asked whether Muhammad could borrow her grandmother's car. After receiving permission, Muhammad drove her grandmother's four-door burgundy Corsica to petitioner's house. When she arrived, petitioner's sister was there along with petitioner, Tucker, and Ganaway. Muhammad further testified that she then left the house with Ganaway and petitioner, who was holding a gasoline can. She drove to a gas station, where petitioner left the car with the gas can while Ganaway remained in the car. Petitioner got back into the car with the gasoline can and directed her to drive around several streets. Petitioner eventually told her to stop the car, and he and Ganaway left with the gas can and headed toward an alley, returning about 5 to 10 minutes later. She then drove them back to petitioner's house. In response to her question of what was going on, petitioner asked if she

remembered "Nicky." Muhammad answered that she did, and petitioner replied, "that's whose body we burned."

¶ 11        D'Andre Weaver testified that at about 11:45 a.m. on December 29, 1997, he was looking out of the second-story window in his bedroom waiting for his mother to return from the grocery store. While looking out of his window, he saw a dark reddish Chevrolet car parked at his neighbor's house, and two guys got out of the car and walked into the alley. He could not see their faces, but one was carrying a gas can. After leaving the window for a few minutes, Weaver returned and saw the same two guys running toward the red car with the gas can. They got into the car, and the driver, who had remained in the car, drove off. Weaver further testified that about 5 to 10 minutes after the car drove away, he heard fire engines, sirens, and police cars. He returned to the window and saw smoke coming from the alley. Later, a police officer rang his doorbell, and Weaver spoke with the officer about what he had seen.

¶ 12        Michelle McClendon testified that, on December 29, 1997, she was petitioner's girlfriend and was at his house with him and Ganaway when they told her they had burned Giles's body. Later, when she and petitioner were alone, she asked whether he had a conscience, and he answered that he did. McClendon further testified that she asked how the gun was put in the victim's car, and petitioner stated that one of his friends asked for Giles's keys to put something in her car and they then snuck the gun in the car. According to McClendon, petitioner stated that, while they were in Giles's car, one of them said he had to urinate. When Giles pulled over and stopped under the viaduct, they pulled her out of the car. Petitioner told her that he shot Giles in the head, and she fell to the ground. McClendon testified that she did not believe petitioner at the time but subsequently saw the murder reported on the television news and began to believe what petitioner had been saying. On December 31, 1997, two police officers arrived at her home in the middle of the night and escorted her to a police station. At trial, McClendon identified a picture of a rifle and testified that she had seen that weapon twice within the month prior to the shooting, once at Northcutt's home and again at petitioner's house.

¶ 13        Chicago police detective Michael McDermott testified that petitioner arrived at the police station on December 30, 1997, and was advised of his rights. McDermott also testified that he informed petitioner of the status of the investigation, including

- 4 -

that witnesses had seen someone up against a car and another person shoot the victim, that the shooting took place under a viaduct, and that a rifle had been recovered. Petitioner then made a statement in which he admitted shooting and robbing Giles.

¶ 14        Assistant State's Attorney John Karnezis testified that he had advised petitioner of his constitutional rights and that petitioner had answered his questions. Petitioner agreed to make a court-reported statement, which he and Karnezis reviewed and signed. Karnezis read petitioner's 70-page statement into the record, without objection.

¶ 15        In that statement, petitioner, who was 18 years old at the time, admitted his involvement in the murder of Giles and the disposal of her body. Petitioner indicated that sometime prior to December 28, 1997, he, Northcutt, and Ganaway decided to rob Giles because they believed she would have a large sum of money in her possession. They also decided that they would kill her because she knew them. They formulated a plan for carrying out the robbery and murder. Pursuant to the plan, petitioner contacted Giles on December 28, 1997, and asked her to come over. After she arrived, petitioner asked Giles for her car keys, and he and Ganaway put a semiautomatic rifle in her car. Later, while she was driving the three of them around, Northcutt indicated that he had to urinate. Giles stopped under a viaduct, and Northcutt exited the car. Ganaway pulled Giles from the car, and petitioner shot her in the head. They placed a bag over her head and pushed her back into the car. They removed $50 from Giles's pocket and drove around before placing her body into a garbage can. They then drove to a south suburb and parked Giles's car on a side street near a train station before taking the train back to the city. The following day, after learning that fingerprints can be left on clothing, petitioner and Ganaway returned to the garbage can in which they had placed Giles's body. Ganaway poured gasoline into the can, and petitioner lit a gasoline-soaked bandana that had been put at the top of the garbage can. Petitioner's statement also described conversations that he had with Tucker, McClendon, and Muhammad in which he admitted his participation in the shooting of Giles and burning of her body.

¶ 16        The State did not present any physical evidence directly linking petitioner to the crime. Petitioner did not testify, and the defense rested without presenting evidence.

¶ 17    At the conclusion of the trial, petitioner was convicted of first degree murder, aggravated vehicular hijacking, armed robbery, and concealment of a homicide. The circuit court sentenced petitioner to a term of natural life for the murder conviction, a consecutive 30-year term for armed robbery, a concurrent 30-year term for aggravated vehicular hijacking, and a consecutive 5-year term for concealment of a homicide.

¶ 18    Petitioner's conviction and sentences were affirmed on direct appeal. *People v. Robinson*, No. 1-00-2981 (2002) (unpublished order under Illinois Supreme Court Rule 23). This court denied leave to appeal. *People v. Robinson*, 202 Ill. 2d 691 (2003) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 19                        B. Postconviction Proceedings

¶ 20    Petitioner filed a *pro se* postconviction petition in January 2005, asserting various claims of ineffective assistance of counsel. The circuit court advanced the postconviction petition to the second stage. The circuit court determined that petitioner had failed to make a substantial showing of a constitutional violation and dismissed his petition. The appellate court affirmed the second-stage dismissal of the petition. See *People v. Robinson*, 2015 IL App (1st) 123360-U. This court denied leave to appeal. *People v. Robinson*, No. 119184 (Ill. Sept. 30, 2015).

¶ 21    In May 2015, petitioner filed a motion for leave to file a successive postconviction petition seeking relief under the Act. Petitioner's motion alleged, *inter alia*, a claim of actual innocence. In particular, petitioner asserted that he was not involved in the crimes for which he had been convicted and that Giles had been murdered by Tucker. In support, petitioner included his own affidavit as well as the affidavits of Yasmyn Johnson, Andre Mamon, Donald Shaw, and Tavares Hunt-Bey.

¶ 22    Petitioner's affidavit averred that, on the day of Giles's murder, he contacted her for her assistance with transporting gang weapons but she never arrived at his home. Petitioner further averred that, after spending the evening hours with Fatique Williams, Yasmyn Johnson, and Michelle McClendon, he spent the night at the apartment of Natasha Veasley-Boone and that she subsequently told him that she would deny they spent that night together.

¶ 23    In addition, petitioner's affidavit averred that he and Tucker were members of different sects of the same gang and had learned that Giles had received money from her cousin, who belonged to a rival gang. According to petitioner's affidavit, Tucker considered Giles as "bait" in the ongoing war between the rival gangs. Petitioner's affidavit explained that he had not come forward with this information previously because he feared for his safety and because a gang rule precluded him from cooperating with the police against a fellow gang member. Lastly, petitioner averred that his trial attorney as well as his counsel on direct appeal and initial postconviction proceeding "were all made privy to this information" and that the "majority of these details herein was actually in my initial statement while being questioned by [d]etectives that was not used."

¶ 24    The affidavit of Yasmyn Johnson, dated November 10, 2014, averred that she was with petitioner, who was her boyfriend, on December 28, 1997. According to Johnson's affidavit, she and petitioner were at her sister's apartment when the sun went down, and they were together for one to two hours. Johnson's affidavit further averred that she remembered the date because it was three days after Christmas and that was the night she suspected petitioner of cheating on her with another girl in the same building.

¶ 25    Andre Mamon's affidavit, dated December 19, 2014, averred that a few days after Christmas in December 1997, he witnessed someone get shot and shoved into a car. According to Mamon's affidavit, he was with his father and three women on the night of the shooting. The group had just left a liquor store at 87th Street and South Colfax Avenue and was walking toward 88th Street to catch the bus on South Chicago Avenue when they heard the horn from a car that was parked across the street. The three women waved and yelled "hello" to a guy named "Lenny," who was sitting in the car with one other guy. Mamon and his companions continued walking to the bus stop on Kingston Avenue. After standing there for a little while, their attention was diverted to the viaduct across South Chicago "after a bright flash and loud gun shot." Mamon's affidavit averred that he saw "Lenny shove an A.K. into the back seat of the car" he had been sitting in. Mamon then observed that "Lenny and two guys with him got in the car and disappeared through the viaduct." When the bus arrived, Mamon and his companions "got on it and out of there."

¶ 26    Mamon's affidavit also averred that, in August 2014, he had a telephone conversation with an individual who asked whether he knew a person named "Ricky." The caller explained that "Ricky" had been "locked up" for a murder on South Chicago Avenue for a long time, but Mamon did not know petitioner as "Ricky" because petitioner went by a nickname. According to his affidavit, Mamon recalled the shooting incident he had witnessed years before, "but the name to go with the face he saw was Lenny." Later, while at a prison dining table, Mamon saw the name "Ricky" on petitioner's shirt, and he asked petitioner "if he had a murder that happened under a viaduct right off South Chicago." When petitioner answered in the affirmative, Mamon told petitioner that he was at the bus stop when the incident occurred and that petitioner's face was not one of the faces he had seen that night. Mamon averred that he prepared the affidavit knowing that he did not see petitioner under that viaduct on the night of the shooting and that petitioner was not guilty.

¶ 27    Donald Shaw's affidavit, dated March 5, 2015, averred that from approximately January 1995 to August 1999, he spent time "hang[ing] out on the block of 89th Bennett" in Chicago. According to Shaw's affidavit, an acquaintance recently told him about some information on Facebook pertaining to petitioner, which caused him to recall events that occurred on the evening of December 28, 1997. Shaw's affidavit averred that, while he was hanging out in the alley behind 8918 South Bennett Avenue, a dark-colored Ford Contour drove past him and then stopped a couple of garages further down the alley. When he approached, he recognized the car's occupants as "three guys that hung out with [petitioner]." One of the men was Tucker, whom Shaw knew well, and they shook hands. During a brief conversation with Tucker, Shaw observed another occupant, who was holding an AK-type assault rifle, get out of the back seat of the car. That person ran down a gangway on the other side of the alley toward Constance Avenue and, after a minute or two, came back empty-handed. He then got into the back seat of the car, and the three men drove off. Shaw's affidavit averred that he could say "with absolute certainty that [petitioner] was not in that Ford Contour with Tucker" on December 28, 1997. The affidavit further averred that, during the ensuing years, Shaw had not realized that this information could have been helpful.

¶ 28    The affidavit of Tavares Hunt-Bey, dated April 25, 2014, averred that he was at a gas station on 87th Street and Exchange Avenue between 10 and 11 a.m. on

December 29, 1997, when he observed a "red-maroonish color Chevy Corsica pull into the gas station." Hunt-Bey approached the car and recognized the driver as a former fellow gang member whose name was Leonard "Lenny" Tucker. After displaying a gang sign, Tucker and two other gang members exited the vehicle and shook hands with Hunt-Bey. According to the affidavit, one of the men went to pay for the gas, and the other person got back in the car while Tucker stood outside and conversed with Hunt-Bey. In response to Hunt-Bey's inquiry as to what the three men were doing that morning, Tucker stated that he had killed the sister of a rival gang member the night before under a viaduct on South Chicago Avenue and that Hunt-Bey should be "on point" because that rival gang might seek revenge. Tucker also said that he had borrowed the car from a friend "to tie up some loose ends." Tucker then removed a gas can from the floor of the front passenger side of the car and began pumping gas into it while the person who paid for the gas got back into the passenger seat. After Tucker finished pumping the gas, he exchanged gang signs with Hunt-Bey and got into the driver's seat and drove away with his two companions in the car.

¶ 29        Hunt-Bey's affidavit further averred that, the following day, he heard the news that petitioner had confessed to the killing and setting the body on fire. Hunt-Bey averred that he immediately knew petitioner was "taking the rap for Lenny" but the "code of silence" imposed by their gang prevented him from contacting the police because "snitching on a fellow member" was a "death violation." According to Hunt-Bey's affidavit, he recently heard that Tucker had falsely testified against petitioner and, because Tucker was no longer a gang member, Hunt-Bey felt obligated to come forward with this information.

¶ 30        In ruling on petitioner's motion, the circuit court determined that the affidavit of Johnson was not newly discovered evidence because he would have been aware of his own whereabouts on the night of the murder and could have presented his girlfriend's alibi evidence at trial. The circuit court also determined that, although the affidavits of Shaw, Hunt-Bey, and Mamon were newly discovered and material evidence, they did not totally vindicate or exonerate petitioner. The court observed that, because none of the affiants witnessed the murder of Giles or the burning of her body, their affidavits were not of such a conclusive character as to probably change the outcome on retrial. The court also found that Hunt-Bey's averments as to Tucker's confession would be inadmissible hearsay. The circuit court concluded

that petitioner failed to raise a colorable claim of actual innocence and, therefore, denied his request for leave to file a successive postconviction petition.

¶ 31 Petitioner challenged the circuit court's decision, contending that he had alleged a colorable claim of actual innocence that was supported by the affidavits of Shaw, Mamon, and Hunt-Bey. 2018 IL App (1st) 153547-U, ¶ 3.

¶ 32 The appellate court held that petitioner's confession, which was consistent with the testimony of several State witnesses, overwhelmingly pointed to petitioner as the person who murdered Giles and burned her body and that the new evidence would not totally vindicate or exonerate petitioner. *Id.* ¶¶ 35-47. The court found that the affidavits of Mamon, Shaw, and Hunt-Bey did little to exonerate petitioner, noting that none of the affiants saw the murder take place or saw who burned the body. *Id.* ¶ 36. The court noted that Shaw only observed someone apparently disposing of a rifle. *Id.* ¶ 38. Mamon does not state that he actually saw the murder and cannot point to any of the three men he saw as the shooter. *Id.* ¶ 40. The court reasoned that Tucker's statement to Hunt-Bey claiming a role in the murder was rebutted by the evidence at trial, including petitioner's confession and the testimony of the State's witnesses. *Id.* ¶ 42.

¶ 33 The court determined that the affidavits merely conflicted with the trial evidence and were not of such a conclusive character as to probably change the result on retrial. *Id.* ¶ 47. Given each affidavit's individual deficiencies and in light of the strong evidence of petitioner's guilt presented at trial, the court could not find that " 'no reasonable juror would have convicted him in light of the new evidence.' " *Id.* (quoting *People v. Edwards*, 2012 IL 111711, ¶ 31). The court concluded that petitioner failed to raise a colorable claim of actual innocence based on the three affidavits. *Id.* The court affirmed the circuit court's denial of petitioner's leave to file a successive postconviction petition. *Id.* ¶¶ 48-50.

¶ 34 Petitioner filed a petition for leave to appeal, which we allowed pursuant to Illinois Supreme Court Rules 315 (eff. Apr. 1, 2018) and 612 (eff. July 1, 2017).

¶ 35                                II. ANALYSIS

¶ 36        Petitioner argues that the lower courts erred in denying him leave to file his
*pro se* successive postconviction petition because he alleged a colorable claim of
actual innocence. Thus, the sole issue presented is whether petitioner should be
granted leave to file his successive petition.


¶ 37                             A. Standard of Review

¶ 38        This court has not previously articulated the standard of review applicable to
the denial of leave to file a successive postconviction petition premised on a claim
of actual innocence. In addressing this question, we are guided by the principles
that comport with the nature of that determination.

¶ 39        Where the issue on review is limited to the sufficiency of the allegations in a
postconviction petition, there is little justification for affording deference to the
circuit court's decision. *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998). Given
that no factual findings or credibility determinations are required at the pleading
stage of postconviction proceedings, a reviewing court is as capable as the circuit
court of determining whether a petition and supporting documents contain adequate
allegations. *Id.* at 388. Because the sufficiency of a postconviction petition is a
purely legal question, *de novo* review is appropriate. *People v. Sanders*, 2016 IL
118123, ¶ 31 (holding the circuit court's dismissal of a postconviction petition is
subject to plenary review); *Coleman*, 183 Ill. 2d at 389 (same); see also *People v.
Chambers*, 2016 IL 117911, ¶¶ 78-79 (holding that a ruling on the sufficiency of a
motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), is
reviewed *de novo*). Therefore, a ruling on a motion requesting leave to file a
successive postconviction petition claiming actual innocence parallels the
determination of whether to dismiss an initial petition based on the legal sufficiency
of the allegations. In addition, the denial of a motion for leave to file a successive
petition alleging cause and prejudice is reviewed *de novo* (*People v. Wrice*, 2012
IL 111860, ¶¶ 49-50), as is a similar ruling premised on statutory construction
(*People v. Bailey*, 2017 IL 121450, ¶¶ 12-13).

¶ 40        In light of these governing principles, this court recognized in *Edwards*, 2012
IL 111711, ¶ 30, that the assessment of whether, as a matter of law, a colorable

claim of actual innocence has been asserted suggests the *de novo* standard of review. Since *Edwards*, several appellate panels have applied the *de novo* standard in similar cases. See *People v. Warren*, 2016 IL App (1st) 090884-C, ¶¶ 72-75; *People v. Adams*, 2013 IL App (1st) 111081, ¶ 30; *People v. Green*, 2012 IL App (4th) 101034, ¶ 30. Based on the reasoning set forth above, we now affirmatively hold that the denial of leave to file a successive postconviction petition alleging actual innocence is reviewed *de novo*.

¶ 41                                   B. The Post-Conviction Hearing Act

¶ 42        The Act provides a statutory remedy to criminal defendants who assert claims for substantial violations of their constitutional rights at trial. *Edwards*, 2012 IL 111711, ¶ 21. The Act is not a substitute for an appeal but offers a mechanism for a criminal defendant to assert a collateral attack on a final judgment. *Id.* Therefore, where a petitioner has previously challenged a judgment of conviction on appeal, the judgment of the reviewing court will serve to bar postconviction review of all issues actually decided by the reviewing court as well as any other claims that could have been presented to the reviewing court. *Id.* As a consequence, only one postconviction proceeding is contemplated under the Act. *Id.* ¶ 22. However, the bar against successive proceedings will be relaxed on two grounds. *Id.* The first is where the petitioner can establish cause and prejudice for the failure to assert a postconviction claim in an earlier proceeding. *Id.* (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)); see also 725 ILCS 5/122-1(f) (West 2014). The second is where the petitioner asserts a fundamental miscarriage of justice based on actual innocence. *Edwards*, 2012 IL 111711, ¶ 23 (citing *Pitsonbarger*, 205 Ill. 2d at 45, and *People v. Ortiz*, 235 Ill. 2d 319 (2009)).

¶ 43        Prior to commencing a successive postconviction petition, a petitioner must obtain leave of court. *Id.* ¶ 24 (citing *People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)). A request to file a successive petition based on actual innocence is reviewed under a higher standard than that applicable to the first stage for an initial petition, which only requires that the petition is not frivolous or patently without merit. *Id.* ¶¶ 25-29; see also *People v. Smith*, 2014 IL 115946, ¶ 35 (holding that a higher standard also applied to a successive petition based on cause and prejudice). If leave to file is granted, a successive petition is docketed for second-stage proceedings, at which

the petitioner must make a substantial showing of actual innocence to warrant an evidentiary hearing. *Sanders*, 2016 IL 118123, ¶¶ 25-28, 37; *Wrice*, 2012 IL 111860, ¶ 90. The substantial showing required to avoid dismissal at the second stage is greater than the standard that must be satisfied to obtain leave to file a successive petition. See *Smith*, 2014 IL 115946, ¶ 29 (recognizing that the three-stage process for postconviction proceedings should not be rendered superfluous); see also *People v. Morrow*, 2019 IL App (1st) 161208, ¶ 51; *People v. Lee*, 2016 IL App (1st) 152425, ¶ 47.

¶ 44    A request for leave to file a successive petition should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence. *Sanders*, 2016 IL 118123, ¶ 24 (citing *Edwards*, 2012 IL 111711, ¶ 24). Accordingly, leave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence. *Id.*

¶ 45    At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. *Id.* ¶¶ 42, 48; *Pitsonbarger*, 205 Ill. 2d at 455; *Coleman*, 183 Ill. 2d at 380-81, 385. In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations. *Sanders*, 2016 IL 118123, ¶ 42; *Coleman*, 183 Ill. 2d at 390.

¶ 46                                C. Actual Innocence

¶ 47    To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32; see also *People v. Coleman*, 2013 IL 113307, ¶ 96; *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *Coleman*, 2013 IL 113307, ¶ 96. Evidence is material if it is relevant and probative of the petitioner's innocence. *Id.* Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* (citing *People v. Molstad*, 101 Ill. 2d 128, 135 (1984)). Lastly, the conclusive

character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id.* ¶ 96 (citing *Ortiz*, 235 Ill. 2d at 336-37). The conclusive character of the new evidence is the most important element of an actual innocence claim. *Washington*, 171 Ill. 2d at 489.

¶ 48 Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Coleman*, 2013 IL 113307, ¶ 97. The new evidence need not be entirely dispositive to be likely to alter the result on retrial. *Id.* (citing *People v. Davis*, 2012 IL App (4th) 110305, ¶¶ 62-64). Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *Id.*

¶ 49 D. Petitioner's Motion and Supporting Documentation

¶ 50 The question in this case is whether petitioner has set forth a colorable claim of actual innocence. Accordingly, we consider his motion for leave to file the successive petition, along with the supporting affidavits, to ascertain whether he has raised the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.

¶ 51 We first address the affidavit of petitioner, which was attached to his motion for leave to file the successive petition. Petitioner's affidavit averred that, on the day of Giles's murder, he contacted her for her assistance with transporting gang weapons but she never arrived at his home. Petitioner further averred that, after spending the evening hours with Fatique Williams, Yasmyn Johnson, and Michelle McClendon, he spent the night at the apartment of Natasha Veasley-Boone and that she subsequently told him that she would deny they spent that night together.

¶ 52 In addition, petitioner's affidavit also averred that he and Tucker were members of different sects of the same gang and had learned that Giles had received money from her cousin, who belonged to a rival gang. According to petitioner's affidavit, Tucker considered Giles as "bait" in the ongoing war between the rival gangs. Petitioner's affidavit explained that he had not come forward with this information previously because he feared for his safety and because a gang rule precluded him

- 14 -

from cooperating with the police against a fellow gang member. Lastly, petitioner averred that his trial attorney and his counsel on direct appeal and initial postconviction proceeding "were all made privy to this information" and that the "majority of these details herein was actually in my initial statement while being questioned by [d]etectives that was not used."

¶ 53 As set forth above, evidence is newly discovered where it was discovered after trial and where the petitioner could not have discovered it earlier through the exercise of due diligence. *Id.* ¶ 96; *People v. Harris*, 206 Ill. 2d 293, 301 (2002). By its own terms, petitioner's affidavit demonstrates that the information contained therein was known to him before trial and had been communicated to police detectives and to his trial counsel. Also, to the extent that the affidavit includes information that can be construed as alibi evidence, petitioner obviously was aware of that information prior to trial, and there is no indication that petitioner's attorney attempted to subpoena these witnesses to testify at trial, nor is there any explanation of why subpoenas were not issued. See *Edwards*, 2012 IL 111711, ¶ 38 (citing *Harris*, 206 Ill. 2d at 301). In addition, the prior gang rule against cooperating with police against a fellow gang member did not inhibit petitioner's ability to present this alibi evidence. Moreover, petitioner's averment that he was no longer bound by that rule does not implicate Tucker in Giles's murder or explain that petitioner incriminated himself in order to take responsibility for crimes committed by a fellow gang member. For all of these reasons, the content of petitioner's affidavit is not newly discovered and will not be considered in support of his claim of actual innocence.

¶ 54 With regard to the affidavits of Mamon, Shaw, and Hunt-Bey, the appellate court assumed the validity of the circuit court's finding that they satisfied the newly discovered and materiality elements of an actual innocence claim (2018 IL App (1st) 153547-U, ¶¶ 30, 36), and the State does not challenge that determination here. Accordingly, we review only the determination of whether the evidence set forth in the affidavits of these three uninvolved and disinterested parties was of such a conclusive character as would probably change the outcome on retrial.

¶ 55 We initially observe that the lower courts erred in applying an incorrect standard when considering the sufficiency of those three affidavits. The circuit and appellate courts cited *People v. Barnslater*, 373 Ill. App. 3d 512, 520 (2007), and

*People v. Collier*, 387 Ill. App. 3d 630, 636 (2008), respectively, in employing a standard that requires evidence of total vindication or exoneration to support a claim of actual innocence. See 2018 IL App (1st) 153547-U, ¶¶ 35, 38. Both *Barnslater* and *Collier* relied on the appellate court's opinion in *People v. Savory* for that proposition. 309 Ill. App. 3d 408, 414-15 (1999) (addressing the statutory standard applicable to a postjudgment motion for DNA testing). However, in reviewing *Savory*, this court specifically rejected the total vindication or exoneration standard and explained that "evidence which is 'materially relevant' to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim." *People v. Savory*, 197 Ill. 2d 203, 213 (2001).

¶ 56   As previously noted, the new evidence supporting an actual innocence claim need not be entirely dispositive to be likely to alter the result on retrial. *Coleman*, 2013 IL 113307, ¶ 97. Rather, the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.* Contrary to the approach taken by the lower courts, we apply the standard set forth above.[1]

¶ 57   We further note that the appellate court erroneously premised its decision on a "conflicting evidence" standard. The appellate court held that the evidence in petitioner's supporting affidavits does not satisfy the conclusive character element because it merely conflicts with the evidence presented at trial (2018 IL App (1st) 153547-U, ¶ 47), and the State argues for affirmance on this ground. But this is not the proper inquiry at the leave-to-file stage of successive postconviction proceedings. This court has never held that a request for leave to file a successive petition must be denied if the new evidence conflicts with the trial evidence. And, indeed, such a requirement would be fundamentally illogical. If the new evidence of innocence does not contradict the evidence of petitioner's guilt at trial, the filing of the successive petition would be pointless, and the purpose of the Act would be rendered meaningless, which is a result that must be studiously avoided. See 725 ILCS 5/122-1(f) (West 2014) (authorizing the filing of a successive postconviction petition); see also *Coleman*, 183 Ill. 2d at 382 (recognizing that, where a petitioner's

---

[1]Although the State argues in its brief that petitioner's supporting affidavits do not constitute "conclusive proof" or "conclusive evidence" of his innocence, the State conceded at oral argument that this court has never held that total exoneration is a requirement for an actual innocence claim.

postconviction claims are premised on matters outside the record, the Act does not contemplate that such claims will be adjudicated on the pleadings).

¶ 58    Although this court has occasionally made reference to the insufficiency of new evidence that conflicts with trial evidence, we have not done so where the relevant inquiry involved a request for leave to file a successive petition based on actual innocence. Rather, those "conflicting evidence" references were made in cases that decided whether a petition should advance to a third-stage evidentiary hearing (see *Sanders*, 2016 IL 118123, ¶¶ 48, 52) or whether a new trial should be granted following such a hearing (see *Coleman*, 2013 IL 113307, ¶¶ 105, 114; *Ortiz*, 235 Ill. 2d at 336-37). The difference between those cases and the procedural posture of this case is critical because a petitioner who requests leave to file a successive petition need not satisfy even the substantial showing burden to advance to the third stage—let alone the evidentiary burden to obtain a new trial after a third-stage hearing. As explained above, the standard for alleging a colorable claim of actual innocence falls between the first-stage pleading requirement for an initial petition and the second-stage requirement of a substantial showing. See *Smith*, 2014 IL 115946, ¶ 29; see also *Morrow*, 2019 IL App (1st) 161208, ¶ 51; *Lee*, 2016 IL App (1st) 152425, ¶ 47.

¶ 59    In arguing for affirmance, the State places significant reliance on *Sanders* for the proposition that new conflicting evidence is insufficient to justify granting leave to file a successive petition. However, given its significantly different procedural context, *Sanders* does not control the result here.[2] In *Sanders*, we held that the new evidence presented in that case did not satisfy the substantial showing requirement to avoid dismissal at second-stage proceedings. *Sanders*, 2016 IL 118123, ¶ 55. But, as noted above, that standard is inapplicable here. Moreover, the decision in *Sanders* was also premised on the fact that a critical aspect of the new evidence— an assertion that the victim had been shot only once—was positively rebutted by autopsy evidence at trial establishing that the victim had been shot twice and died of multiple gunshot wounds. *Id.* ¶ 48.

---

[2]We also summarily reject the assertion made by the State at oral argument that our precedent holding that the allegations in supporting affidavits must be accepted as true applies only to the fact that, if called as a witness, the affiant would testify consistently with the content of the affidavit. This court has never held, or even suggested, that the "accept as true" principle is confined to that limitation.

¶ 60    In this case, the appellate court apparently believed that the evidence in the supporting affidavits was positively rebutted simply because it was contradicted by the evidence presented at trial. That was error because recognizing the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted. For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible—like the single-gunshot evidence in *Sanders*. We now clarify that the inquiry applicable at the leave-to-file stage of successive proceedings does not focus on whether the new evidence is inconsistent with the evidence presented at trial. Rather, the well-pleaded allegations in the petition and supporting documents will be accepted as true unless it is affirmatively demonstrated by the record that a trier of fact could never accept their veracity. In assessing whether a petitioner has satisfied the low threshold applicable to a colorable claim of actual innocence, the court considers only whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial.

¶ 61    With the proper standards and analytical framework in mind, we consider the sufficiency of the supporting affidavits at issue here. The only disputed question is whether the allegations in the affidavits of Shaw, Mamon, and Hunt-Bey, which must be taken as true, are sufficient as a matter of law to establish a colorable claim of actual innocence. *Id.* ¶¶ 40, 42. Resolution of that issue requires that we ascertain whether the supporting affidavits raise the probability that it is more likely than not that no reasonable juror would have convicted petitioner. *Id.* ¶ 24; *Edwards*, 2012 IL 111711, ¶ 24. Credibility findings and determinations as to the reliability of the supporting evidence are to be made only at a third-stage evidentiary hearing in a successive postconviction proceeding. *Sanders*, 2016 IL 118123, ¶ 42; *Coleman*, 183 Ill. 2d at 390-91.

¶ 62    The State argues that Mamon's affidavit is insufficient because it is internally inconsistent as to the number of people who were with Tucker on the night of the shooting and because the trial testimony by two eyewitnesses indicates that Mamon could not have been certain that petitioner's "face wasn't one of the faces he saw that night."

¶ 63 We disagree. First, the averments regarding the number of Tucker's companions are not necessarily inconsistent. Those allegations reflect that Mamon first saw Tucker with one man and then later observed him with two men under the viaduct. The affidavit indicates that some time had elapsed between Mamon's first and second observations of Tucker and also that the location of the car had changed. Considering the affidavit as a whole, it is clear that a third person could have joined Tucker or could have been simply outside of Mamon's initial field of vision. The different references to the number of people present with Tucker is precisely the type of factual allegation that may be explored at an evidentiary hearing, but they are not an adequate reason to entirely reject the affidavit at the pleading stage of the proceedings.

¶ 64 Next, we find the State's argument that Mamon could not be certain that petitioner was not under the viaduct at the time of the shooting to be without merit. According to the State, Mamon could not have seen that petitioner was not present because other occurrence witnesses testified that they could not discern the features of the men underneath the viaduct.

¶ 65 As set forth above, Mamon averred that, in December 1997, just days after Christmas, he witnessed someone get shot and shoved into a car. While standing at a bus stop, immediately after the occurrence of a bright flash and a gunshot, Mamon saw Tucker shove an AK-type weapon into the back seat of the car. Tucker and two men then got in the car and disappeared through the viaduct. Mamon's affidavit includes an unqualified averment that petitioner's face was not one of the faces that he saw that night. The State offers nothing in support of its assertion that Mamon could not have seen the faces of the men under the viaduct. The State fails to discuss or explain the different vantage points of the other occurrence witnesses, their positioning or distance involved with regard to the viaduct, and the lighting conditions or any obstructions that may have also been present. Mamon's affidavit places Tucker, not petitioner, at the scene of Giles's murder with an AK-type assault rifle in his hand. Although these allegations conflict with the record, they are not positively rebutted.

¶ 66 The State also challenges the sufficiency of Shaw's affidavit, claiming that it only concerned the concealment of evidence, in which Tucker was already implicated. The State maintains that Shaw's observation of someone disposing of

- 19 -

a rifle would not exonerate petitioner. Further, the State argues that this evidence would only serve to impeach Tucker, as the trial evidence already showed that he was involved in hiding Giles's pager and ammunition.

¶ 67    In his affidavit, Shaw averred that he saw Tucker on December 28, 1997, driving a dark-colored Ford Contour in the alley behind the address of 8918 South Bennett Avenue, with two of petitioner's acquaintances. While Shaw conversed with Tucker, one of the passengers got out of the car with an AK-type assault rifle, ran down a gangway on the other side of the alley, and returned without the rifle after one or two minutes. Shaw further averred that petitioner was not in the car.

¶ 68    Accepting these allegations as true, Shaw's affidavit places Tucker in the same type of car that Giles drove, on the night of her murder with the possible murder weapon in the area where the gun was found. The police recovered the AK-type assault rifle they believed to have been used in the murder in the alley of 8900 South Bennett Avenue. Further, Shaw averred that petitioner was not in the car with Tucker, which corroborates Mamon's affidavit that petitioner was not in the car with Tucker under the viaduct. More importantly, the affidavit directly contradicts trial testimony by placing Tucker, and not petitioner, in Giles's car on the evening of the murder.

¶ 69    Finally, we reject the State's argument with regard to the impeachment of Tucker. The purpose of impeaching evidence is to attack the credibility of a witness and not to establish the truth of the impeaching evidence. *People v. Bradford*, 106 Ill. 2d 492, 499 (1985). Credibility determinations are not relevant at the motion for leave to file stage of successive postconviction proceedings. *Coleman*, 183 Ill. 2d at 385 (1998).

¶ 70    The State similarly challenges Hunt-Bey's affidavit as insufficient to provide conclusive evidence of petitioner's innocence. The State maintains that Hunt-Bey's affidavit is rebutted by Muhammad's trial testimony and by petitioner's incriminating statement. The State also posits that Hunt-Bey's affidavit is consistent with petitioner's guilt under an accountability theory. Lastly, the State contends that this affidavit contains inadmissible hearsay.

¶ 71    The State concedes that Hunt-Bey's averment, that he saw Tucker with two others in a red-maroonish Chevy Corsica at a gas station filling a gas can, is

consistent with trial testimony that the men who burned Giles's body were in such a car. The State maintains, however, that the fact that Hunt-Bey saw Tucker, and not petitioner, in the car was rebutted by Muhammad's testimony that she drove petitioner and Ganaway. The State also maintains that Hunt-Bey's affidavit was further rebutted by petitioner's statement that he and Ganaway were in the car with Muhammad during the trip to the gas station before they lit the garbage can on fire.

¶ 72        Hunt-Bey avers that, between 10 and 11 a.m. on December 29, 1997, he encountered Tucker and two other men in a red Corsica at a gas station. According to Hunt-Bey's affidavit, Tucker confessed to murdering a woman the night before under a viaduct on South Chicago Avenue. Tucker also said that he had to "tie up some loose ends" prior to filling a gas can and leaving the station. The next day Hunt-Bey heard that petitioner had confessed to the murder and the burning of the body. Hunt-Bey stated that he, Tucker, and petitioner were in the same gang and that, because of its "code of silence," he knew petitioner was "taking the rap" for Tucker and he could not come forward with this information sooner.

¶ 73        We observe that Hunt-Bey's affidavit is consistent with the trial record regarding the location and timing of the murder. It is also consistent with the timing of the burning of Giles's body and the type of car the men used. Thus, this affidavit substantiates, with detailed circumstantial evidence, the occurrences of Giles's murder and the burning of her body. Further, Tucker's confession is an admission of guilt by the culpable party and, therefore, identifies a different offender. See *Ortiz*, 235 Ill. 2d at 337 (recognizing that the identification of a different offender provides evidence that the facts and surrounding circumstances should be scrutinized more closely to determine the petitioner's guilt or innocence); see also *Molstad*, 101 Ill. 2d at 136. The fact that the affidavit conflicts with, but is not positively rebutted by, the State's witnesses on the identification of the person who killed Giles is insufficient to reject it. Instead, it is a reason to allow petitioner to proceed, with counsel, on his colorable claim of actual innocence.

¶ 74        The State also posits that the averment of Tucker's confession in Hunt-Bey's affidavit does not preclude petitioner's guilt. According to the State, Tucker's confession does not unequivocally assert that he personally shot Giles and could be construed as an admission that he was involved in her murder with accomplices, including petitioner. The State also contends that petitioner's admission that he

- 21 -

planned the murder would make him accountable even if an accomplice had pulled the trigger. In support, the State relies on our decision in *Edwards*, which held that a codefendant's affidavit stating that he was the principal offender was not conclusive proof of innocence because petitioner could still have been accountable. *Edwards*, 2012 IL 111711, ¶ 39.

¶ 75    This argument is entirely without merit. In *Edwards*, this court observed that the newly discovered evidence did little to exonerate the petitioner, who was convicted of the murder under the theory of accountability. *Id.* Here, the State never introduced an accountability theory into the case. Petitioner was not charged or indicted under such a theory, and accountability was not argued at trial.

¶ 76    We observe that Hunt-Bey's affidavit is not only consistent with other evidence in the record regarding the circumstances of Giles's shooting and the burning of her body, but it also presents new evidence of significant details that are missing from the record. Further, the affidavit provides evidence that a different party is guilty, which is of such a conclusive character as to lead to a different result on retrial. See *People v. White*, 2014 IL App (1st) 130007, ¶ 29.

¶ 77    In considering the sufficiency of Hunt-Bey's affidavit, we also address the parties' arguments as to the admissibility of his averment that Tucker confessed to the murder. Petitioner argues that this averment must be considered in ascertaining whether he has alleged a colorable claim of actual innocence. The State opposes petitioner's argument based on its assertion that Tucker's confession would be inadmissible hearsay at a new trial.

¶ 78    The parties acknowledge that Illinois Rule of Evidence 1101(b)(3) (eff. Sept. 17, 2019) specifically provides that the rules of evidence do not apply to postconviction hearings. The State maintains, however, that the averment of Tucker's confession does not enhance the validity of petitioner's actual innocence claim. In the State's view, because Tucker's confession would be inadmissible hearsay on retrial, it cannot be considered in assessing the conclusive character of petitioner's newly discovered evidence. In support of this argument, the State relies on *People v. Wallace*, 2015 IL App (3d) 130489, ¶ 29, for the proposition that inadmissible hearsay "is insufficient as a matter of law to support a claim of actual innocence." The State's reliance is misplaced because *Wallace* cited *People v. Coleman*, 2012 IL App (4th) 110463, ¶ 55, as authority for that proposition.

*Coleman*, however, was decided before Rule 1101 was amended to include postconviction hearings among the list of proceedings to which the rules of evidence do not apply. Ill. R. Evid. 1101(b)(3) (eff. Apr. 8, 2013). Thus, cases decided prior to the amendment of Rule 1101 do not govern a postconviction court's consideration of hearsay evidence. See *People v. Velasco*, 2018 IL App (1st) 161683, ¶¶ 119, 123 (taking as true, pursuant to Rule 1101(b)(3), hearsay allegation that another gang member bragged to affiant about committing the murder and advancing actual innocence petition to third stage); *Warren*, 2016 IL App (1st) 090884-C, ¶¶ 166-67; (Gordon, J., specially concurring) (finding that admissibility is not the standard even at third-stage postconviction hearings and indicating that this should apply more strongly at earlier stages where the imprisoned defendant lacks ready access to counsel).

¶ 79        The State also relies on *People v. Shaw*, 2019 IL App (1st) 152994, ¶ 67, which posited that, because the evidence supporting an actual innocence claim must be of such a conclusive character that it would probably change the result on retrial, the court's assessment of that evidence "necessarily encompasses a determination of whether that evidence would be admissible at a retrial." However, the *Shaw* court proceeded to consider the hearsay affidavit supporting the petitioner's claim because the amendment of Rule 1101 made the evidence rules inapplicable to postconviction proceedings. *Id.*

¶ 80        In accordance with the dictates of Rule 1101(b)(3), Tucker's confession, as set forth in Hunt-Bey's affidavit, must be considered in evaluating petitioner's actual innocence claim, and we hold that such evidence is of such a conclusive character as to probably change the outcome at a retrial. See *White*, 2014 IL App (1st) 130007, ¶¶ 26-29 (finding that a new affidavit identifying someone else as the murderer was sufficient to advance the successive petition to the second stage even where the affidavit conflicted with trial evidence of multiple witnesses identifying the defendant, noting that the affidavit would require credibility determinations that the court could not make); *People v. Adams*, 2013 IL App (1st) 110081, ¶ 36 (finding that, where the statement of a witness is both exonerating and contradicts a State witness, it can be capable of producing a different outcome at retrial).

¶ 81        We note that the parties have also presented opposing arguments as to whether Tucker's confession is reliable and trustworthy and would be admissible at a new

trial. Those arguments are premised on *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973), in which the United States Supreme Court articulated four factors that are relevant in determining whether there are sufficient indicia of trustworthiness to admit an extrajudicial confession. However, given the procedural posture of this case, the parties' reliability arguments are premature. See *Sanders*, 2016 IL 118123, ¶¶ 33, 42 (holding that credibility determinations are made at a third-stage evidentiary hearing); *Coleman*, 183 Ill. 2d at 385 (same); *Warren*, 2016 IL App (1st) 090884-C, ¶¶ 96-97, 164; (holding that a determination as to the trustworthiness of statements is an issue that should be considered first by the trial court). The final determination as to the admissibility of Tucker's extrajudicial confession cannot, and should not, be made until after petitioner has overcome the hurdles of second- and third-stage proceedings. Accordingly, questions regarding the admissibility and reliability of such evidence are not relevant considerations at the motion for leave to file stage of a successive postconviction proceeding.

¶ 82       Here, no physical or forensic evidence linked petitioner to the crimes, and no eyewitness identified him as being involved or even present at the time of the relevant events. The only trial evidence directly linking petitioner to the crimes was his own inculpatory statement and the testimony of Tucker, Muhammad, and McClendon, the State witnesses to whom petitioner allegedly confessed. We note, however, that both Tucker and Muhammad themselves were implicated in the offenses, where Tucker admittedly possessed physical evidence consisting of Giles's pager and the box of ammunition and Muhammad testified that she drove petitioner and Ganaway to a gas station on the day Giles's body was burned. Also, McClendon admitted that she did not contact the police despite allegedly learning of petitioner's involvement in the crimes.

¶ 83       Although this testimony and petitioner's lengthy, detailed statement provide evidence of his guilt, that trial evidence is directly contradicted by the affidavits of Mamon, Shaw, and Hunt-Bey, who were not involved in the crimes. Without engaging in any credibility determinations, there is no way for this court—or any court—to assess the reliability of those affidavits or the veracity of their assertions. Taking as true the allegations in the supporting affidavits, as we must at the pleading stage, we conclude that a fact finder could determine that the new evidence exculpates petitioner from any involvement in the crimes and refutes the State's evidence at trial. Accordingly, we find that petitioner's motion and supporting

documentation contain evidence of such a conclusive character that, when considered along with the trial evidence, would probably lead to a different result. See *Coleman*, 2013 IL 113307, ¶ 96. In light of our conclusion, we hold that the lower courts erred in denying him leave to file his successive postconviction petition. Based on the foregoing, we need not address petitioner's other contentions of error by the appellate court.

¶ 84                                    III. CONCLUSION

¶ 85        In sum, the only issue presented in this case is whether petitioner may file his successive postconviction petition that alleges he is actually innocent of the crimes for which he has been convicted and sentenced. The new evidence supporting the petition need not be completely dispositive of petitioner's innocence. Rather, it need only be of such a conclusive character as to probably change the result upon retrial. Granting leave to file means that the petition advances to second-stage proceedings, at which counsel will be appointed and the State can either move for dismissal or file an answer. Because petitioner has satisfied the pleading requirements for granting leave to file a successive postconviction petition, his claim of actual innocence must be advanced to second-stage proceedings. Accordingly, we reverse the judgments of the appellate and circuit courts and remand the cause to the circuit court for further proceedings.

¶ 86        Judgments reversed.

¶ 87        Cause remanded.

¶ 88        JUSTICE MICHAEL J. BURKE, dissenting:

¶ 89        Reading the majority opinion, one would think that it is still an open question what standard applies at the leave-to-file stage of postconviction proceedings when a petitioner raises a freestanding claim of actual innocence. That is incorrect. In *People v. Edwards*, this court explained that "leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in light of the

new evidence.' " *People v. Edwards*, 2012 IL 111711, ¶ 24 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). This standard has been faithfully applied by Illinois courts ever since. Today, a majority of this court holds that the correct standard is something else entirely. According to the majority, the correct standard is "whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial." *Supra* ¶ 60. This standard has no foundation in this court's case law. The appellate court correctly applied the *Edwards* standard and correctly determined that petitioner failed to satisfy it. I therefore cannot join the majority opinion.

¶ 90                                   *Edwards*

¶ 91        In *Edwards*, the petitioner was found guilty of first degree murder on an accountability theory. *Edwards*, 2012 IL 111711, ¶ 3. His conviction was largely based on his own statement placing him at the scene of the crime. *Id.* ¶ 7. After the petitioner's direct appeal and initial postconviction proceedings were unsuccessful, the petitioner sought leave to file a successive postconviction petition. *Id.* ¶ 9. The circuit court denied leave to file, finding that the petitioner could not establish cause and prejudice. *Id.* The appellate court affirmed. *Id.*

¶ 92        The petitioner then sought leave to file his third postconviction petition. The petition alleged actual innocence and was supported with two affidavits. *Id.* ¶ 10. The circuit court once again denied leave to file. *Id.* ¶ 11. The petitioner then sought leave to file his fourth postconviction petition, once again alleging actual innocence based on newly discovered evidence and once again supported by two affidavits. *Id.* ¶ 12. The circuit court denied leave to file the fourth postconviction petition. *Id.* ¶ 14. The appeals of the denials of his third and fourth petitions were consolidated. *Id.* ¶ 15. The appellate court affirmed the circuit court's denial of leave to file the petitions, finding that the petitioner had failed to state a claim of actual innocence. *Id.* ¶¶ 15-16. Justice Gordon dissented, arguing that the appellate court had applied the wrong standard. According to Justice Gordon, a "low threshold" applied at the leave-to-file stage of successive postconviction proceedings, and leave to file should be denied only if the petition had no arguable basis in law or fact. *Id.* ¶ 17. This court allowed the petitioner's petition for leave to appeal. *Id.* ¶ 18.

¶ 93    This court began its analysis by explaining that the parties' dispute centered on "the standard a petitioner claiming actual innocence must meet in seeking leave of court to initiate a successive postconviction proceeding under the Act." *Id.* ¶ 20. This court then explained that the standard is as follows:

> "With respect to those seeking to relax the bar against successive postconviction petitions on the basis of actual innocence, we hold today that leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence. See *People v. Smith*, 341 Ill. App. 3d 530, 536 (2003) (citing *Sawyer*, 505 U.S. at 339 (actual innocence defined in context of federal *habeas* petitions as colorable claim of factual innocence)); *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003) (*habeas* petitioner must initially come forward with new reliable evidence to support 'colorable claim of actual innocence' under fundamental-miscarriage-of-justice exception). Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence' (*Schlup v. Delo*, 513 U.S. 298, 327 (1995) (characterizing threshold standard as one of probability))." *Id.* ¶ 24.

¶ 94    This court next gave several reasons why it was rejecting the position of the petitioner and the appellate court dissent that the low threshold applicable to the first stage of initial postconviction petitions should be applied to the leave-to-file stage of successive postconviction proceedings. First, the "leave of court" language in section 122-1(f) of the Act would be rendered superfluous if this court applied the "frivolous or patently without merit" standard to a successive petition. *Id.* ¶¶ 25-26.

¶ 95    Second, section 122-1(f) makes no mention of a frivolous or patently without merit standard. *Id.* ¶ 27. Third, the legislative history of section 122-1(f) confirmed that (1) the Act contemplates only one postconviction petition being filed without leave of court and (2) the legislature intended to make Illinois law consistent with federal law in this manner. This court explained that the legislative history supported a conclusion that a " 'colorable claim of actual innocence' " standard should apply and that this would be consistent with the standard federal courts use

when applying the fundamental-miscarriage-of-justice exception. *Id.* ¶ 28. Finally, this court explained that it is well settled that successive postconviction petitions are disfavored and that applying a first stage standard to a successive petition would be inconsistent with this principle. *Id.* ¶ 29.

¶ 96    The court then considered the supporting documentation that the petitioner provided and determined that the petitioner had failed to establish that it was more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Id.* ¶¶ 31-40. The court explained that affidavits that the petitioner provided from alibi witnesses were not newly discovered. *Id.* ¶¶ 34-37. That left only the affidavit of a witness who said that the petitioner " 'had nothing to do with this shooting' " and that the petitioner was neither " 'a part [of nor] took part in this crime.' " *Id.* ¶ 39. This court agreed with the appellate court that this evidence did " 'little to exonerate' " the petitioner because he was convicted on an accountability theory. *Id.* Thus, the court held that the petitioner had failed to show that, in light of the new evidence, it was more likely than not that no reasonable juror would have convicted him. *Id.* ¶ 40. In other words, the petitioner's evidence was not " 'of such conclusive character that it would probably change the result on retrial.' " *Id.* (quoting *People v. Morgan*, 212 Ill. 2d 148, 154 (2004)).

¶ 97    Thus, the very question facing the *Edwards* court was what standard applies at the leave-to-file stage of successive postconviction proceedings when a petitioner brings a freestanding claim of actual innocence. This court thoroughly analyzed that question, adopted a standard, explained where that standard came from, and set forth several reasons why a lower standard did not apply. This is not an open question.

¶ 98                          The Appellate Court's Analysis

¶ 99    Contrary to what the majority claims, the appellate court did not apply an improper standard. The appellate court properly applied *Edwards* and determined that petitioner had failed to make the required showing. 2018 IL App (1st) 153547-U, ¶¶ 36-47. The majority mischaracterizes the appellate court's analysis in two important ways. First, the majority claims that:

"The appellate court held that petitioner's confession, which was consistent with the testimony of several State witnesses, overwhelmingly pointed to petitioner as the person who murdered Giles and burned her body and that the new evidence would not *totally vindicate or exonerate petitioner*." (Emphasis added.) *Supra* ¶ 32 (citing 2018 IL App (1st) 153547-U, ¶¶ 35-47).

Here is what the appellate court actually said in paragraph 47 of its opinion:

"Muhammad, McClendon, and Tucker all testified to defendant's involvement in Giles's murder and corroborated defendant's own court-reported confession. This evidence overwhelmingly pointed to defendant as the person who murdered Giles and burned her body. Accordingly, the affidavits of Shaw, Mamon, and Hunt-Bey are not of such a conclusive character that they would probably change the result on retrial, as they merely conflict with defendant's confession and other testimony presented at trial. See *People v. Mabrey*, 2016 IL App (1st) 141359, ¶ 30. Given each affidavit's individual deficiencies and in light of the strong evidence of defendant's guilt presented at trial, we cannot find that 'no reasonable juror would have convicted him in light of the new evidence[.]' *Edwards*, 2012 IL 111711, ¶ 31. Defendant therefore has failed to present a colorable claim of actual innocence based on these affidavits." 2018 IL App (1st) 153547-U, ¶ 47.

¶ 100    In other words, the appellate court correctly applied the *Edwards* standard and determined that petitioner failed to meet it. Rather than simply citing this paragraph, the majority cites paragraphs 35 to 47. *Supra* ¶ 32. By using this 12-paragraph citation, the majority brings in paragraph 35 of the opinion, where the appellate court was citing boilerplate legal principles applicable to actual innocence claims and said that the " 'hallmark of "actual innocence" means "total vindication," or "exoneration." ' " 2018 IL App (1st) 153547-U, ¶ 35 (quoting *People v. Collier*, 387 Ill. App. 3d 630, 636 (2008), citing *People v. Savory*, 309 Ill. App. 3d 408, 414-15 (1999)). The majority later explains that a petitioner is not required to demonstrate total vindication or exoneration. *Supra* ¶ 55. Nevertheless, as clearly demonstrated above, when it came time to apply the law to the facts, the appellate court held that petitioner had failed to meet the *Edwards* standard and therefore had failed to present a colorable claim of actual innocence. 2018 IL App (1st) 153547-U, ¶ 47.

¶ 101    In further attempting to demonstrate that the appellate court applied an incorrect standard, the majority states that, "The court found that the affidavits of Mamon, Shaw, and Hunt-Bey did little to exonerate petitioner, noting that none of the affiants saw the murder take place or saw who burned the body." *Supra* ¶ 32 (citing 2018 IL App (1st) 153547-U, ¶ 36). Here is what paragraph 36 of the appellate court opinion actually says:

> "Here, even assuming that the attached affidavits of Shaw, Mamon, and Hunt-Bey are newly discovered and material and noncumulative, they are not of such a character as to probably change the result on retrial. As our supreme court noted in *People v. Edwards*, 2012 IL 111711, to set forth a colorable claim of actual innocence, a defendant's 'request for leave of court and his supporting documentation [must] raise the probability that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence[.]' *Edwards*, 2012 IL 111711, ¶ 31. Defendant's evidence cannot meet this burden." 2018 IL App (1st) 153547-U, ¶ 36.

Once again, the majority claims that the appellate court is applying an exoneration standard when it is in fact applying the *Edwards* standard.

¶ 102    The appellate court's only use of the word "exonerate" in its application of the law to the facts was when it stated that Shaw's affidavit did not exonerate petitioner but merely provided circumstantial evidence to challenge the sufficiency of the evidence supporting petitioner's conviction. *Id.* ¶ 38. But this court also used "exonerate" in this same fashion in *Edwards* when it stated that it agreed with the appellate court that one of the petitioner's affidavits did " 'little to exonerate defendant.' " *Edwards*, 2012 IL 111711, ¶ 39. It is difficult to see why the appellate court's isolated use of the very same word this court used in *Edwards* amounts to reversible error.

¶ 103    The majority's second major mischaracterization of the appellate court opinion is when the majority claims that the appellate court applied an improper "conflicting evidence" standard. This misreading of the appellate court opinion is significant, as the majority later uses it as justification to replace the *Edwards* standard with a new one. The majority initially states—correctly—that the appellate court held that the petitioner could not meet the conclusive-character element because his evidence merely conflicted with the evidence presented at trial.

*Supra* ¶ 57. However, the majority thereafter ignores the appellate court's use of the word "merely" and criticizes the appellate court for holding that a petitioner's evidence can be rejected on the basis that it conflicts with the trial evidence. *Supra* ¶ 57. The majority states that this court has "never held that a request for leave to file a successive petition must be denied if the new evidence conflicts with the trial evidence." *Supra* ¶ 57. The majority then claims that the appellate court was taking a "fundamentally illogical" position because rejecting new evidence of innocence on the basis that it conflicts with trial evidence would make the filing of successive petitions pointless and render the purpose of the Act meaningless. *Supra* ¶ 57.

¶ 104    With all due respect to my colleagues in the majority, this is simply not what the appellate court was saying. By ignoring the appellate court's use of the word "merely," the majority makes it sound like the appellate court was saying something absurd when in fact the appellate court was saying something quite reasonable. The appellate court did *not* hold that petitioner failed to meet his burden because his evidence *conflicted* with the trial evidence. Rather, the court held that petitioner failed to meet his burden because his evidence *merely conflicted* with the trial evidence. The appellate court stated that, "the affidavits of Shaw, Mamon, and Hunt-Bey are not of such a conclusive character that they would probably change the result on retrial, as they merely conflict with defendant's confession and other testimony presented at trial." 2018 IL App (1st) 153547-U, ¶ 47. The appellate court did *not* find petitioner's new evidence insufficient because it conflicted with the trial evidence. Rather, it found it insufficient because that is all it did. In other words, petitioner's new evidence conflicted with the trial evidence but fell short of being conclusive. Obviously, all evidence of actual innocence will necessarily conflict with evidence that established a petitioner's guilt beyond a reasonable doubt. That is the whole point of such evidence. But it must do *more* than merely conflict; it must be conclusive. The conclusiveness of the new evidence is the most important element of an actual innocence claim. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Here, the appellate court held that petitioner's evidence merely conflicted with the trial evidence but was not conclusive as to his innocence.

¶ 105    There is nothing at all unreasonable or incorrect about what the appellate court held. Indeed, this court has found newly discovered evidence insufficient on this same basis. As the majority concedes, this court held in *People v. Sanders*, 2016 IL 118123, that a petitioner's newly discovered evidence was insufficient when it

merely conflicted with the trial evidence but was not conclusive. Here is this court in *Sanders* explaining why it found the petitioner's new evidence insufficient:

> "This leaves the testimony of petitioner denying all involvement and that of his girlfriend, Felicia Hollivay, who provided an alibi for petitioner starting at midnight on the night of the murder. Thus, *Bingham's recantation is contrary not only to his own testimony at petitioner's trial, but also to the testimony of Ramseur and Barfield*, who positively identified petitioner as being with Bingham and May at Barfield's house the night of the murder and as having participated in the events leading up to Cooks' murder. It is also contradicted by the pathologist's testimony that Cooks was shot twice in the head, not once, as Bingham claimed in his recantation. Bingham's recantation testimony *merely adds conflicting evidence to the evidence adduced at the trial. Even taking the well-pleaded facts as true, we conclude that the recantation is not of such conclusive character as would probably change the result on retrial*.

> The same must be said of the factual statements in DeRamus's affidavit. *Her statements merely contradict the testimony of other occurrence witnesses*. Further, we note that DeRamus's statement that Bingham "marched" Cooks out the back door of Barfield's house directly contradicts Bingham's recantation testimony when he said that he picked up Cooks, threw him over his shoulder, and took him out the back door. *Like Bingham's recantation, DeRamus's proposed testimony would merely add to the evidence the jury heard at petitioner's trial. It is not so conclusive in character as would probably change the result on retrial, either by itself or in conjunction with Bingham's recantation*." (Emphases added.) *Id.* ¶¶ 52-53.

¶ 106    The majority tries to distinguish *Sanders* by arguing that it was decided in a "significantly different procedural context" because it was decided at the second stage rather than at the leave-to-file stage. *Supra* ¶ 59. But this is a distinction without a difference, as both the leave-to-file stage and the second stage are stages in which all well-pleaded factual allegations are taken as true.[3] In *Sanders*, this

---

[3]The appellate court reached the same conclusion in *People v. Brown*, where it noted:

> "Although we recognize that *Sanders* arose from a *slightly different procedural posture* than this case, in that it was an appeal from a second-stage dismissal of a successive postconviction petition (and it was unclear whether the trial court in *Sanders* recognized that it

court, while acknowledging that it had to take all well-pleaded facts as true (*Sanders*, 2016 IL 118123, ¶¶ 31, 33), still rejected the petitioner's evidence on the basis that all it did was add conflicting evidence to what the jury already heard (*id.* ¶¶ 52-53). Similarly, the appellate court here, although it was required to take the affidavits as true, could still properly find that petitioner failed to meet his burden when his new evidence merely added conflicting evidence to what the jury heard but was not conclusive as to his innocence. The difference between the leave-to-file stage and the second stage is that the petitioner must at the leave-to-file stage raise the *probability* that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence (*Edwards*, 2012 IL 111711, ¶ 33), while at the second stage the petitioner's burden raises from a "probability" to a "substantial showing" (*Sanders*, 2016 IL 118123, ¶ 37). If the majority believes that the difference in the first- and second-stage burdens is relevant to whether a court may find new evidence insufficient on the basis that it merely conflicts with trial evidence, then it is incumbent on the majority to explain why. It is not sufficient to simply state that the two are "significantly different procedural contexts."

¶ 107    The majority also distinguishes *Sanders* on the basis that a critical aspect of the new evidence in that case was positively rebutted by autopsy evidence. *Supra* ¶ 59. But, as the above block quote from *Sanders* demonstrates, other evidence was found to be insufficient because it merely conflicted with the *testimony* of other occurrence witnesses and was not conclusive. The majority simply ignores this aspect of *Sanders*.

¶ 108    The appellate court recently interpreted *Sanders* to mean that leave to file may be properly denied when a petitioner's new evidence merely adds conflicting evidence to what the jury heard but falls short of being conclusive. See *People v. Simms*, 2020 IL App (1st) 161067. In that case, the court upheld the trial court's denial of leave to file a successive postconviction petition alleging actual innocence. In discussing *Sanders*, the appellate court noted:

---

was a successive petition before docketing it for further proceedings), *the requirement that all well-pleaded factual allegations are taken as true applies equally in this case as in Sanders*, and it is thus helpful to our analysis of this issue." (Emphases added.) *People v. Brown*, 2017 IL App (1st) 150132, ¶ 61 n.2, *vacated on other grounds and appeal dismissed*, No. 123252 (Ill. Jan. 24, 2019).

- 33 -

"In *Sanders*, the codefendant stated he was alone when he committed the offense and that his prior testimony identifying the petitioner as participating in the crime was not true. *Id.* ¶ 16. A witness who provided an affidavit in support of the successive postconviction petition averred that the codefendant acted alone at all times when she was observing the commission of part of the offense (aggravated kidnapping). *Id.* ¶ 15. If all that were required was to take the recantation and averment as true and would be believed by a reasonable juror and ask if the defendant could still be convicted, then the result of the petitioner's trial in *Sanders* would have to have been different: based on that "true" evidence Sanders did not commit aggravated kidnapping and did not participate in the murder. The only explanation for our supreme court's holding is that more is required of courts considering claims of actual innocence." *Id.* ¶ 42.

The court followed *Sanders* and held that the trial court correctly denied leave to file the successive postconviction petition because the petitioner's newly discovered evidence was not conclusive as to his innocence but merely added conflicting evidence to the evidence heard at trial, including the petitioner's multiple confessions. *Id.* ¶¶ 43-47.

¶ 109    Presiding Justice Ellis dissented, arguing that his primary disagreement with the majority was over what it meant to take an affidavit as true. *Id.* ¶ 53 (Ellis, P.J., dissenting). The dissent argued that the majority merely assumed that the affiant would testify consistently with the affidavit at a new trial. *Id.* ¶ 54. By contrast, the dissent argued that a court must assume that a reasonable juror would *believe* the testimony at a new trial and that the proper inquiry is whether "it is more likely than not that no reasonable juror, hearing and believing this evidence, alongside all the other evidence presented at trial, could convict defendant." (Emphasis omitted.) *Id.* ¶ 57. Applying this standard, the dissent concluded that the petitioner had presented fully exonerating evidence. *Id.* ¶¶ 72-73.

¶ 110    The *Simms* dissent's position simply cannot be reconciled with *Sanders*. If this court in *Sanders* had assumed that a reasonable juror would *believe* the petitioner's newly discovered evidence, then this court would have had no choice but to reverse the lower courts and remand for an evidentiary hearing. If a reasonable juror believed the petitioner's new evidence, then that juror would have no choice but to

acquit the petitioner at a new trial. That is *not* what this court held. The majority claims that this court has "never held, or even suggested," that the taken-as-true requirement means that an "affiant would testify consistently with the content of the affidavit." *Supra* ¶ 59 n.2. However, in *People v. Coleman*, 183 Ill. 2d 366 (1998), this court set forth what it meant to take an affidavit as true in the context of a postconviction petition alleging ineffective assistance of counsel at the aggravation/mitigation phase of a capital sentencing hearing. This court stated:

> "We, therefore, will examine defendant's assertions on their merits. In so doing, *we will assume the truth of all defendant's well-pleaded allegations* in conformity with the procedural posture of this case. *In other words, we will presume that had defense counsel called these witnesses, they would have testified in a manner consistent with their affidavits* and that the proffered evidence would have been considered by the sentencing judge as required under our death penalty statute." (Emphases added.) *Id.* at 403.

While the above statement was made in a slightly different context, the sense in which it used "taken as true" must have been the sense in which this court was applying the "taken as true" requirement in *Sanders*. If this court were assuming that a reasonable juror would *believe* the new evidence, this court would have had no choice but to reverse. Merely assuming that the affiant would testify consistently with the affidavit is consistent with *Edwards*, which requires a court to make a probabilistic determination about what a reasonable juror would do at a trial that included the new evidence. See *Edwards*, 2012 IL 111711, ¶ 24; *People v. Coleman*, 2013 IL 113307, ¶ 96 ("conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result").

¶ 111       Moreover, if the position of the *Simms* dissent is correct, then a petitioner seeking leave to file a successive postconviction petition based on actual innocence would have an extremely low burden. Indeed, an evidentiary hearing would be available to any defendant who could find someone to file an affidavit telling a story inconsistent with the trial evidence. Assume a case in which 20 eyewitnesses who knew the defendant personally testified that they saw him commit a murder. Years later, if the defendant could find someone in prison to sign an affidavit saying that he saw the defendant in a different city at the time of the murder, that defendant would automatically be granted leave to file, pass stage two, and be entitled to an

evidentiary hearing. Any such outcome would be completely contradictory to the leave-to-file standard adopted in *Edwards*.

¶ 112    In sum, the appellate court applied the correct standard—*Edwards*—and concluded that leave to file was properly denied. The court explained that:

> "Given each affidavit's individual deficiencies and in light of the strong evidence of defendant's guilt presented at trial, we cannot find that 'no reasonable juror would have convicted him in light of the new evidence[.]' *Edwards*, 2012 IL 11711, ¶ 31. Defendant therefore has failed to present a colorable claim of actual innocence based on these affidavits." 2018 IL App (1st) 153547-U, ¶ 47.

The appellate court's isolated use of the word "exonerate" in the same manner that this court used that term in *Edwards* does not mean that the appellate court applied an improper standard. Moreover, the appellate court did *not* apply an improper "conflicting evidence" standard but rather rejected petitioner's evidence on the basis that it merely conflicted with the trial evidence but fell short of being conclusive.

¶ 113                    The Majority's New Standard

¶ 114    Notwithstanding that the applicable standard at the leave-to-file stage of postconviction proceedings when the petitioner raises a freestanding claim of actual innocence was the precise issue considered and resolved in *Edwards*, the majority holds that the correct standard is something else entirely. The majority, relying on its mischaracterization of the appellate court opinion as adopting a "conflicting evidence" standard, explains:

> "In this case, the appellate court apparently believed that the evidence in the supporting affidavits was positively rebutted simply because it was contradicted by the evidence presented at trial. That was error because recognizing the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted. For new evidence to be positively rebutted, it must be clear from the trial record that no factfinder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably

- 36 -

demonstrated to be false or impossible—like the single-gunshot evidence in *Sanders*. We now clarify that the inquiry applicable at the leave-to-file stage of successive proceedings does not focus on whether the new evidence is inconsistent with the evidence presented at trial. Rather, the well-pleaded allegations in the petition and supporting documents will be accepted as true unless it is affirmatively demonstrated by the record that a trier of fact could never accept their veracity. In assessing whether a petitioner has satisfied the low threshold applicable to a colorable claim of actual innocence, the court considers only whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial." *Supra* ¶ 60.

¶ 115    There are several problems with this passage. First, the majority does not "clarify" anything. This is the elimination of a standard that was previously settled and the replacement of it with an entirely new one. It is difficult to see how this is not an overruling of *Edwards*, given that the very issue in *Edwards* was the standard for these types of claims and the majority now jettisons that standard in favor of a different one. Moreover, the majority never explains why it believes the standard a petitioner has to meet at the leave-to-file stage is an open question. The only window into the majority's thinking on this is when it asserts that,

"the standard for alleging a colorable claim of actual innocence falls between the first-stage pleading requirement for an initial petition and the second-stage requirement of a substantial showing. See *Smith*, 2014 IL 115946, ¶ 29; see also *Morrow*, 2019 IL App (1st) 161208, ¶ 51; *Lee*, 2016 IL App (1st) 152425, ¶ 47." *Supra* ¶ 58.

While this is true, that standard has already been determined by this court in *Edwards*: leave of court should be granted when the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The cited paragraph of this court's decision in *Smith* contains an observation by this court that requiring a petitioner to conclusively establish cause and prejudice prior to being granted leave to file a successive petition "may render the entire three-stage postconviction process superfluous." *People v. Smith*, 2014 IL 115946, ¶ 29. But this is not an invitation to rewrite the standard a postconviction petitioner must meet to obtain leave to file a postconviction petition alleging actual innocence.

*Smith* distinguished *Edwards* on the basis that *Edwards* addressed the standard for successive postconviction petitions alleging actual innocence and was *not* a cause and prejudice case. *Id.* ¶ 32. The two appellate court cases that the majority cites— *Morrow* and *Lee*—merely cite *Smith* for the proposition that the three-stage process should not be rendered superfluous, but they then explain that the *Edwards* "probability" standard applies at the leave-to-file stage and then the higher "substantial showing" standard applies at the second stage. See *People v. Morrow*, 2019 IL App (1st) 161208, ¶ 51; *People v. Lee*, 2016 IL App (1st) 152425, ¶ 47. Thus, the majority's citations confirm that *Edwards* is the proper standard, and the majority has provided no reason at all for why it believes that this court needs to replace that standard with a new one.

¶ 116     Second, this court has *never* described the leave-to-file stage of successive postconviction proceedings as being a "low threshold." [4] The "low threshold" language is how the court describes the first stage of *initial* postconviction proceedings. See, *e.g.*, *People v. Brown*, 236 Ill. 2d 175, 184 (2010) (explaining that first stage of postconviction proceedings presents a low threshold "requiring only that the petitioner plead sufficient facts to assert an arguably constitutional claim"); *People v. Robinson*, 217 Ill. 2d 43, 60 (2005) (noting that a "postconviction petition is frivolous or patently without merit when its allegations, taken as true and liberally construed, fail to present the gist of a constitutional claim" and that the gist standard presents a low threshold). In *Edwards*, the dissenting justice in the appellate court had argued that a "low threshold" standard should also apply at the leave-to-file stage of successive postconviction proceedings. *Edwards*, 2012 IL 111711, ¶ 17. As set forth earlier in this dissent, this court comprehensively *rejected* that view and gave four independent reasons why it was incorrect. *Id.* ¶¶ 26-29. It is well settled that successive postconviction actions are disfavored by Illinois courts (*id.* ¶ 29; see also *People v. Bailey*, 2017 IL 121450, ¶ 39 ("successive postconviction petitions are highly disfavored")), and it is simply not the case that a petitioner seeking leave to file a successive postconviction petition faces a "low threshold."

_____

[4]At oral argument, defense counsel asked this court to follow its "long-standing precedent requiring a low threshold at this stage." There is no such long-standing precedent.

¶ 117    Nor does a postconviction petitioner bringing a freestanding claim of actual innocence face a "low threshold." Quite the opposite. In *Coleman*, this court stated:

> "As we stated in *Washington*, 'no person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence.' *Washington*, 171 Ill. 2d at 489. That statement indicates that the standard we adopted is *extraordinarily difficult* to meet. In fact, as *amicus* informs us and our research confirms, courts of review have granted postconviction relief on actual-innocence claims in only three reported cases since 1996. See *People v. Burrows*, 172 Ill. 2d 169 (1996) (decided the same day as *Washington*); *Ortiz*, 235 Ill. 2d 319; *People v. Starks*, 365 Ill. App. 3d 592 (2006)." (Emphasis added.) *Coleman*, 2013 IL 113307, ¶ 94.

Thus, petitioner was bringing a type of claim that is extraordinarily difficult to succeed on and was doing so in a proceeding that is highly disfavored by Illinois courts. Contrary to what the majority states, there is *nothing* about a freestanding claim of actual innocence brought in a successive postconviction petition that presents a "low threshold" for the petitioner.

¶ 118    Third, the standard "whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial," is virtually meaningless. *Supra* ¶ 60. Anything *could* lead to an acquittal. The jury *could* vote to acquit even in the face of overwhelming evidence of guilt, or the jury *could* engage in jury nullification. Such a standard gives no guidance whatsoever for lower courts to follow, and it is difficult to see how it is much different from the "frivolous or patently without merit" standard rejected in *Edwards*. Previously, this court has focused on *probability*. As this court said in *Edwards*,

> "leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence' (*Schlup v. Delo*, 513 U.S. 298, 327 (1995) (characterizing threshold standard as one of probability))." *Edwards*, 2012 IL 111711, ¶ 24.

Under the majority's new standard, this court likely would have reached the opposite result in *Edwards*. In that case, the petitioner supported his successive petition with the affidavit of Eddie Coleman, a fellow gang member who

participated in the shooting and said that the petitioner had nothing to do with it. This court, applying its newly adopted standard, explained:

> "[E]ven though Eddie's affidavit contains newly discovered evidence, the result is the same. In the affidavit's specific references to petitioner, Eddie averred petitioner 'had nothing to do with this shooting,' he (Eddie) 'never saw or spoke with [petitioner] after the funeral,' petitioner was neither 'a part [of nor] took part in this crime,' and he (Eddie) did not 'share this information [about the shooting] with [petitioner] after the crime.' Though Eddie averred petitioner 'had nothing to do with this shooting' and was neither 'a part [of nor] took part in this crime,' Eddie critically does not assert that petitioner was not present when the shooting took place. As the appellate court correctly noted, Eddie's averment in his affidavit that he was the principal offender 'does little to exonerate defendant who *** was convicted of the murder under the theory of accountability.'
>
> Thus, even though Eddie Coleman's affidavit could be considered new evidence, it does not raise the probability that, in the light of the new evidence, it is more likely than not that no reasonable juror would have convicted petitioner. This evidence is not 'of such conclusive character that it would probably change the result on retrial' (*Morgan*, 212 Ill. 2d at 154). See *Washington*, 171 Ill. 2d at 489, (describing 'conclusive character' requirement as the 'most important[ ]' element of an actual-innocence claim)." (Emphasis omitted.) *Id.* ¶¶ 39-40.

However, if all that the petitioner had to show to get past the leave-to-file stage was that the new evidence, if believed and not positively rebutted by the record, *could* lead to an acquittal, it seems that the petitioner's evidence met that standard. Surely the testimony of a participant in the crime that the petitioner had nothing to do with the crime and neither was a part of it nor took part in it, and was not even told about it, *could* lead to an acquittal, even if the petitioner was charged under an accountability theory. This is clearly *not* the standard this court was applying in *Edwards*.

¶ 119                        Application of the *Edwards* Standard

¶ 120    I agree with the appellate court that petitioner cannot meet the *Edwards* standard. Petitioner has not submitted evidence sufficient to raise a probability that no reasonable juror would have convicted him. Petitioner's newly discovered evidence would add conflicting evidence for a trier of fact to consider, but it is far from conclusive. This court reiterated in *Edwards* that the " 'conclusive character' requirement is the 'most important[ ]' element of an actual-innocence claim" (*Id.* ¶ 40 (quoting *Washington*, 171 Ill. 2d at 489) and that the " 'no reasonable juror' standard 'requires a stronger showing than that required to establish *Strickland* prejudice' " (*id.* (quoting *Morales v. Johnson*, 659 F.3d 588, 605 (7th Cir. 2011))). In *Schlup*, the case from which the *Edwards* standard was derived, the United States Supreme Court explained that the word "reasonable" in the above formulation means that it "must be presumed that a reasonable juror would consider fairly all of the evidence presented" and would "conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Schlup*, 513 U.S. at 329. A court must "assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Id.* at 332; see also *supra* ¶ 47 ("the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result"); *Coleman*, 2013 IL 113307, ¶ 96; *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009).

¶ 121    I agree with the appellate court's assessment of petitioner's newly discovered evidence along with the trial evidence, as set forth in paragraphs 36 through 47 of its opinion, and I would affirm its decision. The appellate court properly noted the deficiencies of each of the affidavits and concluded that they were not of such conclusive character as would probably change the result on retrial, given the overwhelming evidence of petitioner's guilt that was introduced at trial, including petitioner's 70-page, court-reported statement. I wish to focus here on that statement, as it is crucial to understanding why petitioner has failed to raise the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. The majority, as did the appellate court, summarizes that statement in one paragraph, and this does not give a full appreciation of the story that petitioner told. In his statement, petitioner consistently gave details that went far beyond those necessary to establish his guilt of the crime.

¶ 122    In his statement, petitioner explained that, in the weeks prior to December 28, 1997, he and two of his friends, Marques Northcutt and Andrew Ganaway,

formulated a plan to get some money. They decided to rob Nicole Giles, whom they had known for a few months, because they had heard that she had a lump sum of money coming in. She was supposed to be receiving between $200 and $300 from a cousin named Gerry. Initially, the plan was just to rob her, but once they realized that Giles would turn them in to the police, they formulated a plan to kill her. Petitioner explained that he planned to use a MAK-90 semiautomatic rifle to kill Giles, and he identified a picture of the weapon. He said he obtained the weapon from the brother of a man named Daniel Williams.

¶ 123      Petitioner said that he planned to use the $200 to $300 he would get from the robbery to purchase three eight-balls of crack cocaine. He would then cut it down and sell it at a profit. Petitioner believed that he could double his money. He would then take the money he received from selling the crack cocaine and use it to buy a pound of marijuana. He would then take this pound of marijuana to Minnesota to sell it, where he would hopefully double or triple his money. Petitioner said that he could receive a higher price for the marijuana in Minnesota than in Chicago.

¶ 124      On December 28, 1997, Northcutt and Ganaway were at petitioner's house. Petitioner called Giles and asked her to come over for a visit. Giles arrived at petitioner's house in her Ford Contour, which petitioner believed was either a '97 or '98 model. Petitioner described it as being purple or "kind of violet." When Giles arrived at the house, petitioner took her car keys, and then he and Ganaway slipped out so that they could put the MAK-90 into the back seat of her car. They covered the weapon with a laundry bag because they did not want Giles to see it. They feared that, if she saw the weapon, she would know what was going to happen to her.

¶ 125      Petitioner told Giles that it was time to go, and the four of them then got into Giles's car. Giles sat in the driver's seat with Ganaway next to her. Petitioner and Northcutt sat in the back. When they were getting into the vehicle, Giles wanted to see if petitioner and Northcutt had enough room in the back seat. At this point, she noticed the laundry bag. She reached down to touch it and wanted to know what it was and where it came from. Petitioner said, "don't trip," which means "don't worry about it." Ganaway initially told Giles to drive west on 87th Street, but then petitioner took over giving her directions and eventually told her to drive to 88th and Kingston Streets and to stop under a viaduct. This was around 4:45 p.m. The

plan was for Northcutt to tell her that he had to get out of the car under the viaduct so he could go to the bathroom. Northcutt exited the vehicle and went around the back of the car to petitioner's side of the car. Petitioner then opened the back door and set the MAK-90 on the ground.

¶ 126    Northcutt went to a pillar and pretended to urinate. Ganaway exited the vehicle and went around the car to try to open Giles's door. She had locked it, so he was not able to do so. Petitioner then unlocked Giles's door. Ganaway opened it and tried to force Giles out of the car. He was unsuccessful, so Northcutt reached in from the passenger side of the car, grabbed Giles by the left arm, and dragged her out of the car. She then fell to the ground. Petitioner picked up the MAK-90 and approached Giles, who was sitting on the ground, facing away from him. Petitioner then pointed the MAK-90 at Giles's head and squeezed the trigger. Giles fell to the ground, and petitioner did not see her move again. Petitioner then said that he "threw the Mak-90 to the back of the car." Northcutt pulled a plastic bag over Giles's head, and petitioner helped him drag her into the back seat of the car.

¶ 127    The three of them got back into the vehicle, with Ganaway driving. Petitioner told Ganaway to "drive up 90th." Petitioner was looking for a place to get rid of the body. Eventually, petitioner spotted an alley between Crandon and Luella. They drove down the alley, and petitioner noticed three garbage cans next to some branches and twigs. Petitioner then examined the pile of branches to see if it could be moved so that he could put the body under it. Petitioner determined that they did not have time to move the branches, so they decided they would place the body in a garbage can instead. Before placing the body into the garbage can, petitioner reached into Giles's pocket, hoping to find approximately $200. He found only $50, which he handed to Northcutt.

¶ 128    Petitioner noticed that the bag was starting to come off of Giles's face, so he pulled it back over her face so that he would not have to look at her. Northcutt helped him place Giles's body headfirst into the garbage can. They then closed the can and drove away.

¶ 129    The three men drove to the back of a house at 8918 South Bennett Avenue so that Ganaway could get rid of the MAK-90. Petitioner explained that he did not want it in his possession because he did not want to get caught for murder. Ganaway exited the vehicle with the MAK-90 in his hands. He disappeared for "no longer

than a minute," and when he returned, he no longer had the weapon. Ganaway told petitioner that he hid the gun on the side of the garage. Petitioner then drove Giles's car to Country Club Hills. He wanted to ditch the car far from his vicinity and then take the Metra back. When they arrived in Country Club Hills, they went to the house of a friend of Ganaway's. The friend, Megan, was not home, so they drove east on 175th Street and then ditched the car close to the Metra station. Before doing so, the three of them tried to wipe down every surface of the car. Petitioner used his jacket to wipe the car.

¶ 130    They then got rid of the laundry bag that had concealed the MAK-90. The bag was now covered in blood. They placed it in the garbage can of one of the residences in the area. Petitioner then hid the car keys across Dixie Highway by the Metra station. The three of them then took a Metra train that was going north. Petitioner said that it was the E-zone train that arrives at 6:06 p.m. They bought their tickets on the train. Northcutt paid for them with the money they stole from Giles. When Northcutt took the money out of his pocket, petitioner noticed that there was blood on one of the $20 bills. Petitioner advised Northcutt to hand the money to the conductor facedown. Petitioner said that they wanted to get rid of the bill "so he would not be on to us."

¶ 131    The three of them exited the train at 59th Street and University Avenue and then switched over to the B-zone train. That train took them to "95th between Commercial and Buffalo." They got off the train at 91st Street. Petitioner then cut through the park to Lenny Tucker's house. Tucker was petitioner's sister's boyfriend. Tucker lived at 87th and Marquette Streets. Lenny's mother was home, but Lenny was not, so petitioner decided to go home. Northcutt, Ganaway, and petitioner all went to petitioner's house at 87th Street and Colfax Avenue, where they found petitioner's mother, his siblings, and Lenny Tucker. Petitioner proceeded to take off his clothes and advised Northcutt and Ganaway to do the same. Petitioner explained that they had Giles's blood on their clothes. Petitioner placed their clothes in the washing machine. He also had Giles's blood on a pair of his shoes, so he decided to throw the shoes away. The shoes were red, white, and blue Fila low tops, made from both leather and canvas. Petitioner threw them away in the garbage can behind his house.

¶ 132    Petitioner then spoke to Tucker in the kitchen. He told Tucker how they had killed Giles, and Tucker did not believe him. He eventually gave Tucker enough details that Tucker believed the story. Tucker asked about the bag they had kept the MAK-90 in and warned petitioner that the police could get fingerprints off clothes. Petitioner began to worry that they may have left their fingerprints on Giles's body. Petitioner then spoke to Northcutt and Ganaway about the possibility that they had left their fingerprints on Giles's clothing, and they decided that her clothes would need to be burned.

¶ 133    Petitioner called his grandmother to tell her that he was coming over to her house. Petitioner called his girlfriend, Michelle McClendon, and asked her to come and take him to his grandmother's house. He had previously called her and told her how they had murdered Giles. Before the murder took place, he had told her the entire plan about how they had decided to rob and murder Giles, but she was not interested. McClendon came and picked up petitioner, Northcutt, and Ganaway and took them to petitioner's grandmother's house. They stayed for 20 minutes and "fixed left over Christmas plates." They then went back home, where they stayed for no more than two minutes before deciding to leave again to purchase marijuana. They went to 72nd Street and Coles Avenue to buy it but ended up not buying any. They then went to McClendon's house to pick up two of her friends, Myesha and Giovanni. Next, they went to the Shell station at 83rd Street and Stoney Island, after which they dropped Giovanni off at his home in Riverdale. They then dropped off Northcutt at 111th and Bell.

¶ 134    At this point, petitioner, Ganaway, McClendon, and Myesha were in the car. Ganaway told McClendon to drive to 89th Street and South Bennett Avenue, where they had hidden the gun. Ganaway wanted to rehide it because he did not believe that he had hidden it well enough the first time. McClendon drove to 8918 South Bennett Avenue, and Ganaway got out of the car. Ganaway was gone for less than two minutes. When he returned, he explained that he rehid the gun across the alley on the side of the garage. Petitioner then asked McClendon to drive him home. Once they arrived at home, petitioner asked Ganaway and Myesha to exit the vehicle so that he could talk to McClendon alone. Petitioner then told McClendon that he loved her, and she told him that he was going to go to jail. He told her not to think like that. He then went inside and "fixed a plate from [his] Grandma's" and fell asleep.

¶ 135    On the following day, December 29, 1997, Northcutt called petitioner at around 10:30 or 11 a.m. Northcutt said to "get up so that yall could get on that business." Petitioner said that Northcutt was referring to the plan to burn Giles's body to remove any fingerprints. Petitioner decided that they would use gasoline to burn the clothes. He told his sister to get the gas can out of the shed. His sister called her best friend, Maisha Muhammad, to come over. Petitioner had known Muhammad for around four years. She arrived sometime during the day in a four-door, maroon Corsica. Muhammad, Ganaway, and petitioner all got into the vehicle. Petitioner had the gas can with him, and he told Muhammad to drive to the Clark station at 87th Street and Exchange Avenue. Petitioner then bought $1 worth of gas, which was enough to fill the gas can about three-quarters.

¶ 136    Petitioner directed Muhammad to the area of the viaduct, but they were not able to locate the body quickly because petitioner had forgotten which alley they put her in. It took them about 20 minutes to locate the body. They eventually found the correct garbage can, and petitioner noticed that a garbage bag had been placed on top of her. Petitioner said that the garbage can was black with wheels and a handle on top. Ganaway took the gas can to the garbage can and drenched the body with gasoline. Petitioner then closed the garbage can, and Ganaway gave him a bandana to place on top of the garbage can. They soaked the bandana with gasoline, placed one end of it inside the can, touching the body, and left one end hanging out of the can. Ganaway handed him some matches, and petitioner lit the bandana on fire. He then could see nothing but flames, and he and Ganaway ran back to the car. They got in the car, and petitioner told Muhammad that they had just burned Giles's body. Muhammad asked why, and petitioner said that their fingerprints were on it. Muhammad did not ask any more questions; she just wanted to go. Muhammad then took petitioner back home.

¶ 137    At the end of his statement, petitioner reiterates that he came to the police station of his own free will, that no one forced him to come there, and that he had been treated fairly by the police officers, the detectives, and the assistant state's attorney. He said that he had been given food and water and been allowed to rest and use the restroom. He said that no one had threatened him before giving this statement and that no one had promised him anything in return for the statement. He agreed that he gave the statement free of the influence of drugs or alcohol.

¶ 138     What is notable about this statement is the level of detail. Petitioner shares intimate details about all phases of the planning and execution of the crime. Moreover, he consistently goes far beyond giving the facts necessary to establish the crime. He does not merely set forth the basic facts of the crime, such as the shooting of Giles under the viaduct, the disposal of her body in a garbage can, and the subsequent burning of the body. Rather, he also offers such details as (1) the plan to sell marijuana obtained from the proceeds of the robbery in Minnesota, where he could get a better price than in Chicago; (2) Giles noticing the laundry bag in the back of the car and wanting to know what it was; (3) Ganaway unsuccessfully attempting to pull Giles out of the car before Northcutt eventually had to do it; (4) that the initial plan was to dispose of the body under a pile of branches rather than in a garbage can but that they ultimately decided that they did not have time to move the branches; (5) that the bag began to fall off of Giles's face, so petitioner covered it back up so he would not have to look at her; (6) that when they arrived in Country Club Hills, they first went to visit a friend of Ganaway's named Megan, but she was not home; (7) that when Northcutt needed to give money to the Metra conductor, petitioner noticed blood on a $20 bill and told Northcutt to turn the bill over; (8) that when they got off the Metra train, they first went to Tucker's home but found only Tucker's mother there; (9) that when they went to McClendon's house to pick up Myesha, Giovanni was also there, and they took Giovanni home to Riverdale before the rest of the group went to 8919 South Bennett Avenue so that Ganaway could rehide the gun; (10) that Ganaway moved the gun to a different hiding spot because he did not believe he had hidden it well enough he first time; (11) that before McClendon took petitioner and Ganaway to 8918 South Bennett Avenue, she had taken Northcutt, petitioner, and Ganaway to petitioner's grandmother's house, where they had leftover food from Christmas; (12) that when petitioner got back home after the trip to 8918 South Bennett Avenue, he told McClendon that he loved her, and she told him that he was going to jail; (13) that when they went back to the area of the viaduct to burn the body, they initially could not find it because petitioner had forgotten which alley they had left her in, and it took them 20 minutes to find her; and (14) that when they located the correct garbage can, petitioner noticed that someone had placed a bag of garbage on top of Giles's body.

¶ 139     Thus, a reasonable juror would hear that petitioner gave a complete confession to his responsibility for the offense, consistently filling in details of the story that

went far beyond what was necessary to establish his guilt. Additionally, a reasonable juror would hear evidence that petitioner also confessed to Muhammad, McClendon, and Tucker. Elements of petitioner's statement were corroborated by other witnesses. For instance, petitioner's statement that it took a while to find Giles's body because he could not remember which alley he put her in was corroborated by Muhammad, who testified that they rode around several blocks in the area of the viaduct and that they changed directions two or three times. Muhammad testified that petitioner was the one giving directions. Additionally, McClendon corroborated petitioner's statement about getting leftover food at his grandmother's house on December 28, 1997. McClendon testified that petitioner's "grandmother let us in and we went into the kitchen and she showed us where the left over food was, and they began to fix themselves plates and they eight [*sic*]." McClendon further corroborated petitioner's statement that she drove Northcutt to his home at 111th Street and Bell Avenue after they left petitioner's grandmother's house. McClendon also testified to specific details of the crime that petitioner shared with her, such as how he had asked Giles for her keys so that he could hide the weapon in her car, how the plan was to get Giles to pull over by having one of them say that he had to use the bathroom, how they used a bandana to ignite the gasoline, and how someone had dumped garbage on top of Giles's body.

¶ 140     Petitioner's affidavits would give a reasonable juror conflicting evidence to consider, but they were not even close to being conclusive. Hunt-Bey stated in his affidavit that Tucker confessed to him at a gas station near 87th Street and Exchange Avenue on December 29, 1997, filled a container of gas, and said that he had to "tie up loose ends." He then drove away with two unknown men. Hunt-Bey stated that he knew petitioner was "taking the rap for Lenny." However, Tucker testified at trial that petitioner told him that petitioner had committed the crime. Moreover, Muhammad testified that she was the driver of the vehicle in question and that the people she drove to the gas station were Ganaway and petitioner. Hunt-Bey's affidavit was therefore not conclusive as to petitioner's innocence. See *Sanders*, 2016 IL 118123, ¶ 52 ("Bingham's recantation is contrary not only to his own testimony at petitioner's trial, but also to the testimony of Ramseur and Barfield, who positively identified petitioner as being with Bingham and May at Barfield's house the night of the murder and as having participated in the events leading up to Cooks' murder.").

¶ 141    Shaw testified in his affidavit that on December 28, 1997, he observed a dark Ford Contour stop near 8918 South Bennett Avenue. In the vehicle were "three guys that hung with Rickey," including a man named "Lenny." Petitioner was not one of the men in the car. Shaw observed one man exit the car with an assault rifle and run between the gangway toward Constance Avenue. The man returned to the vehicle without the weapon and entered the back seat of the car. This affidavit is not conclusive as to petitioner's innocence. Shaw did not observe Giles's murder and did not reference it in any way. At best, he could add conflicting evidence for the trier of fact to consider about the disposal of the weapon. And his testimony about the disposal of the weapon is directly contradicted by petitioner's statement where petitioner states that he was in the Ford Contour with Northcutt when Ganaway disposed of the weapon. Shaw's affidavit was nowhere near being conclusive as to petitioner's innocence but merely would give a reasonable juror conflicting evidence to consider about the disposal of the weapon.

¶ 142    Finally, Mamon testified in his affidavit that "just days after Christmas" in December 1997 he observed a man named Lenny and another man sitting in a parked car. Shortly thereafter, by a viaduct on South Chicago Avenue, he heard a loud gunshot and saw a bright flash, following which he saw Lenny place an "A.K." in the back seat of a car. Lenny then drove away with two men. Mamon later met petitioner in prison and asked if "he had a murder that happened under a viaduct right off South Chicago." In August 2014, Mamon received a call from someone who asked whether Mamon knew a "Ricky" and explained that Ricky had been locked up for a long time for a murder on South Chicago Avenue. Mamon did not know petitioner as Ricky because he went by a nickname. Mamon stated in the affidavit that petitioner was not one of the men he saw under the viaduct that night.

¶ 143    Mamon's affidavit is internally inconsistent as to how many men were involved. He first saw Lenny and one other man and then said that Lenny was with two other men. Moreover, it is not conclusive as to petitioner's innocence because Mamon does not claim to have seen who shot Giles. It is also contradicted by petitioner's affidavit and petitioner's statements to Muhammad, McClendon, and Tucker. Thus, it would merely give a reasonable juror conflicting evidence to consider.

¶ 144 As the appellate court properly concluded, the evidence against petitioner was overwhelming and included both petitioner's detailed, 70-page statement confessing to the murder and petitioner's confessions to Muhammad, McClendon, and Tucker. The information in petitioner's new affidavits would give the trier of fact conflicting evidence to consider, but petitioner has failed to demonstrate a probability that it is more likely than not that *no reasonable juror* would have convicted him in light of the new evidence. The majority treats petitioner's detailed confession as essentially equivalent to the statement of a disinterested witness. *Supra* ¶ 82. But, presumably, a reasonable juror would assume that petitioner knew whether or not he was responsible for shooting a woman under a viaduct and burning her body to hide the evidence. As the United States Supreme Court has noted, "a full confession in which the defendant discloses the motive for and means of the crime" is powerful evidence of guilt. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). The court explained in that case that:

> "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Id.* (quoting *Bruton v. United States*, 391 U.S. 123, 139-140 (White, J., dissenting, joined by Harlan, J.)

See also *People v. Simpson*, 2015 IL 116512, ¶ 36 ("It has been observed that 'a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable.' " (quoting *People v. R.C.*, 108 Ill. 2d 349, 356 (1985))).

¶ 145 In *People v. Wideman*, 2016 IL App (1st) 123092, the defendant had given a detailed confession to the crime but later sought leave to file a successive postconviction petition alleging actual innocence. In upholding denial of leave to file the petition, the appellate court stated:

> "The defendant essentially asks us to find that it is more likely than not that the jury would choose to entirely disregard the defendant's detailed confession and acquit the defendant, had the jury heard Williams testify that the defendant was merely 'standing there' and 'didn't do anything' to Thomas. The defendant does

- 50 -

not explain why the jury would completely disregard his own words detailing his participation in the crime in favor of Williams' testimony to the contrary. Such a proposition is unreasonable. Clearly, even if the jury were presented with such conflicting evidence, it could easily conclude that the defendant's detailed, self-incriminating statements were entitled to more weight and (along with the other trial evidence) supported a finding of guilt. We certainly cannot say that an acquittal on either the murder or armed robbery charge would be "probable" had Williams testified to the statements in his May 2010 affidavit. Thus, we do not find that the defendant set forth evidence 'of such conclusive character that it would probably change the result on retrial' as is required to allow leave to file a successive petition on the basis of actual innocence." *Id.* ¶ 67 (quoting *Edwards*, 2012 IL 111711, ¶ 32).

Similarly, here, petitioner has failed to sufficiently explain why a reasonable juror would disregard his own detailed confession to the crime, which was corroborated by his confessions to three other people. Petitioner simply cannot meet the *Edwards* standard, and he has thus failed to present a colorable claim of actual innocence. I would therefore affirm the appellate court's decision.

¶ 146    JUSTICES GARMAN and KARMEIER join in this dissent.