2020 IL App (1st) 171508-U

No. 1-17-1508

Order filed September 23, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 18427 |
| | ) | |
| RASHEEM JACKSON, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1 *Held*: The circuit court's second-stage dismissal of defendant's postconviction petition is affirmed where defendant failed to make a substantial showing of actual innocence based on the recanted testimony of a witness.

¶ 2 Defendant Rasheem Jackson appeals from an order of the circuit court of Cook County granting the State's motion to dismiss his petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). On appeal, defendant contends that the court erred in dismissing his petition because he presented a cognizable claim of actual

innocence based on newly discovered evidence that a key witness recanted her trial testimony. We affirm.

¶ 3    Following a 2011 bench trial, defendant was found guilty of attempted first degree murder and aggravated battery with a firearm for shooting cab driver Martial Fifen in the face. The trial court merged the offenses and sentenced defendant to the minimum term of 6 years' imprisonment for attempted murder and an additional 25-year sentencing enhancement for personally discharging the firearm that caused great bodily harm to Fifen, for an aggregate sentence of 31 years' imprisonment.

¶ 4    At trial, 17-year-old DeShawteya Butler testified that on September 19, 2009, she was living at a specific address in the 101st block of South Emerald Avenue. Shortly after 10 p.m., Butler was standing outside on her front porch with one of her cousins while her other cousins and their friends were in her basement. Defendant, who was her sister's cousin, was there. Butler knew defendant since she was a young child, and he had been at her house numerous times. Butler observed a white taxicab arrive and stop next to the neighbor's house. The cab driver was a dark-skinned man. Butler observed defendant and two young men approach and enter the cab together, and the cab drove away.

¶ 5    On cross-examination, Butler acknowledged that defendant was not actually her cousin, but she repeatedly told the police that he was. More than 12 people were at her house that night, about 3 were women and the rest were men. She could not recall what defendant was wearing. The other two men who entered the cab were at her house, but Butler did not know them, did not know their names, had never seen them before, and did not recall what they were wearing. There was no writing or emblem on the white vehicle indicating it was a cab, but she knew "they" had

called someone and were waiting for a ride. Defendant had arrived at her house about 8 a.m. and remained there the entire day. Defendant never showed her a gun that day, nor did she observe him with a gun that evening. Butler did not know what happened after the cab left her house.

¶ 6    Martial Fifen testified that he drove a white Lincoln for a livery cab service. On September 19, about 10 p.m., he picked up a fare at the subject house in the 101st block of South Emerald. When he arrived, Fifen saw a young girl, about 15 to 18 years old, standing on the porch talking to some young boys. One of the boys came down the front steps and asked Fifen if he was the cab. Fifen replied "yes." The boy returned to the porch and continued talking with the girl. Three young men came from the back of the house and entered the rear seat of the cab. In court, Fifen identified defendant as one of the three men.

¶ 7    The men asked Fifen to drive them to 99th Street between State Street and Perry Avenue. When they arrived, the men directed Fifen to drive into the alley to drop them off.  Fifen drove into the alley and stopped the cab. The three men jumped out of the cab and told Fifen to exit the vehicle, which he did. There was artificial lighting in the area from the nearby expressway. Defendant stood three to four feet from Fifen and pointed a gun at him while the other two men searched inside the cab. Fifen asked the men what they were looking for and tried to negotiate with them. Defendant told Fifen to "shut up" and wait for them to finish what they were doing. The two men who had been searching the cab began hitting Fifen and he became engaged in a physical fight with both men. Defendant continued pointing the gun at Fifen and told him to stay away from the cab. Fifen jumped inside the cab, which was still running, and attempted to leave. Defendant fired two or three gunshots at Fifen. One bullet struck the left side of Fifen's nostril, another struck near his right eyebrow, and the last struck his left eyebrow.

¶ 8    Fifen could not recall exactly what happened next but drove himself to Roseland Hospital. Hospital personnel removed Fifen from his vehicle and brought him into the emergency room. Fifen was transferred to Stroger Hospital where he underwent three surgeries. During the third surgery, doctors removed the last bullet. Defendant was the only person with a gun during the offense. Fifen did not have a gun.

¶ 9    At Stroger Hospital, Detective Killeen[1] interviewed Fifen. On September 22, Killeen returned to the hospital and showed Fifen a photo array. Fifen did not identify anyone in that array. On September 24, Killeen came to Fifen's home and showed him a second photo array. Therein, Fifen identified defendant as the man who shot him. On September 30, 2009, Fifen viewed a lineup at the police station and identified defendant as the man who shot him.

¶ 10    On cross-examination, Fifen testified that there was no writing or insignia on his vehicle that indicated it was a cab. The young man talking to the girl on the porch was not defendant. Fifen looked at the three men before they entered his cab. Fifen did not see any of the men with a gun when they entered the cab. Defendant sat in the middle of the other two men in the back seat. Defendant was not wearing a hat or glasses and did not have any facial hair. The first time Fifen got a good look at the three men was in the alley. Defendant drew the gun when defendant exited the cab. Fifen observed the gun when he exited the cab. After exiting, Fifen stood in front of his vehicle while defendant pointed the gun at him and the other men searched the cab. Fifen estimated that he looked at defendant holding the gun for two to three minutes. Fifen was shot as he began driving away. Fifen told police that the gunman was a short man. On redirect examination, Fifen testified that he was sitting inside his vehicle when he was shot.

---

[1] Detective Killeen's first name does not appear in the record.

¶ 11   Detective Killeen testified that on September 19, he went to Stroger Hospital and met with Fifen. Killeen spoke briefly with Fifen but continued their discussion another day because Fifen appeared groggy, in pain, and sedated. After speaking with Fifen, Killeen searched for possible suspects at the Emerald address. He found two possible suspects and created a photo array including their photographs. Killeen showed the photo array to Fifen on September 22. Fifen did not identify anyone. After obtaining further information from Fifen, Killeen spoke with Butler and obtained defendant's name as a possible suspect. Killeen created a second photo array including defendant's photograph and showed it to Fifen on September 24. Fifen "immediately" identified defendant as the man who shot him. Defendant was arrested on September 29. Fifen subsequently identified defendant in a lineup.

¶ 12   Defense counsel offered to stipulate that Killeen could identify defendant in court, and the State accepted the stipulation. On cross-examination, Killeen testified that the two suspects who were included in the first photo array were suspected of possibly being the shooter or two of the men who entered the cab.

¶ 13   The trial court found that based on the evidence, including Butler's testimony that defendant was one of the three men who entered the cab, coupled with Fifen's identification of defendant as the shooter, defendant was guilty of attempted first degree murder and aggravated battery with a firearm. In denying defendant's posttrial motion, the court reiterated that the evidence showed that defendant was the man who shot Fifen and that he had an intent to kill.

¶ 14   This court granted defendant's motion to dismiss his direct appeal. *People v. Jackson*, No. 1-12-0166 (2013) (dispositional order).

¶ 15    On September 12, 2013, defendant mailed to the court a *pro se* petition for postconviction relief filed under the Act asserting, *inter alia*, a claim of actual innocence. Defendant alleged that he had newly discovered evidence that Butler had been coerced by her mother to commit perjury when she testified at trial.

¶ 16    Defendant attached to his petition an affidavit from Butler dated April 16, 2013. Butler averred that at the time of the offense she was underage, did not understand the law, and was scared because she was on probation and supervision due to a fight. Butler stated "[t]hat nite I never really seen where none of those young man [*sic*] went when the cab driver approached my house in a white cab." The cab driver asked if anyone had called a cab, and Butler answered "yes" because she was standing at the door and overheard defendant's two friends, whose names she did not know, say they were going home. Butler stated that her mother told her to tell the police "that I saw them all get into the cab. But I really didn't. I had already closed the door." Butler and her mother thought that if Butler told the police whose friends were involved it would clear her name. Butler stated that she followed her mother's instructions because "we both didn't need anymore situations." Butler stated that she was older now and realized that life in jail was not suitable for someone who had not committed a crime.

¶ 17    Defendant also attached an affidavit from Maurice Williams dated April 15, 2013, averring that defendant was "not around" on September 19 and had nothing to do with the incident. On the day of the offense, defendant told Williams that he was at his cousin's house for the weekend and would return on Monday. Williams stated that he was defendant's closest friend, they had known each other since they were children, and they were together almost every day so he "knew for a fact" that defendant had nothing to do with the shooting. Defendant was a

kind, respectful and generous person who never had a problem with anyone and would never hurt anyone. Williams further stated that consideration should be given to the fact that defendant had been in and out of the hospital due to sickle cell.

¶ 18    The circuit court advanced defendant's postconviction petition to second-stage proceedings under the Act and appointed counsel to represent him. On July 1, 2016, counsel filed an amended postconviction petition and certificate of compliance in accordance with Supreme Court Rule 651(c) (eff. Feb. 6, 2013). The amended petition restated the claims in defendant's *pro se* petition including, *inter alia*, his claim of actual innocence based on Butler's recantation. Attached to the petition were the original affidavits from Butler and Williams, and a new affidavit from Butler dated June 29, 2016. In her new affidavit, Butler restated that she was underage at the time of the offense and testified in accordance with her mother's advice. She told the cab driver that someone from her house had called for a cab, but she did not know the names of the men who did so. Butler averred "I did not see who got in the cab because I had already closed the door." She further stated, "At the time I did not see Rasheem Jackson although he is often at my house."

¶ 19    The State moved to dismiss defendant's petition arguing that the affidavits from Butler and Williams were insufficient to support his claim of actual innocence as neither of them were present during the shooting. The State argued that defendant was ostensibly asserting an alibi defense, which did not constitute newly discovered evidence, and thus, his actual innocence claim was invalid. The State asserted that Butler's partial recantation was not newly discovered evidence where she was thoroughly cross-examined at trial and her testimony was corroborated by the State's other evidence. The State further argued that Butler's recantation did not raise a

constitutional issue where defendant did not allege that the State knowingly used false testimony, and therefore, it was not a cognizable claim under the Act. The State also claimed that Butler's recantation was not of such conclusive character that it would change the outcome of trial where Fifen's testimony alone was sufficient to convict defendant.

¶ 20    In response, defendant argued that Butler's recantation was newly discovered evidence because it was not available until after trial. Defendant further argued that the recantation was probative of his innocence because Butler averred that he was not one of the men who called for the cab and she did not see who entered the cab. Defendant asserted that he did not have to argue that the State knowingly used perjured testimony because he was not making a freestanding claim of a due process violation on that basis. He noted that during second-stage proceedings, the truth of the factual allegations in Butler's affidavit must be presumed, and pointed out that the trial court referenced Butler's testimony when it found him guilty.

¶ 21    At the hearing on its motion to dismiss, the State argued that defendant did not meet the requirements for a showing of actual innocence. The State repeated the arguments in its motion and maintained that Butler's partial recantation was not of such conclusive character that it supported a claim of actual innocence. The State argued that defendant did not present conclusive proof that he did not enter the cab and was not the shooter. Defense counsel argued that the trial court relied on Butler's testimony and that the recantation could change the court's decision. The trial court remarked that Butler's testimony was "one of the key components" of its guilty finding because it was "basically an identification case." The court stated that it found Fifen's identification of defendant reliable because it was corroborated by Butler who knew defendant and identified him as one of the men who entered the cab. The court further stated that

the only doubt it had was resolved because Butler testified that she saw defendant enter the cab. The court continued the case to consider its ruling.

¶ 22    On April 27, 2017, the circuit court stated that it reviewed the evidence, gave the case serious thought, and granted the State's motion to dismiss. In its written order, the court found that Butler's and Williams' affidavits did not support a claim of actual innocence. The court explained that, even assuming Butler's recantation was true, it did not disprove that defendant was present at the shooting or provide him with an alibi. At best, Butler's affidavits undermined only part of the State's case, but there was still overwhelming evidence of defendant's guilt based on Fifen's credible and consistent testimony. The court found that Williams' affidavit did not provide any personal knowledge of defendant's whereabouts on the date of the shooting, but instead, merely recited unverified information defendant allegedly told him and provided his personal opinion of defendant's character. The court concluded that defendant failed to demonstrate a cognizable claim of actual innocence and dismissed his petition.

¶ 23    On appeal, defendant contends that the circuit court erred when it dismissed his petition because he presented a cognizable claim of actual innocence based on newly discovered evidence that Butler recanted her trial testimony. Defendant claims that Butler's recantation provided new evidence that he did not enter the cab, and therefore, he was not at the scene of the crime and could not have been the shooter. Defendant points out that at the hearing on the State's motion to dismiss, the circuit court stated that Butler's testimony that she saw defendant enter the cab was a key component of its guilty finding and corroborated Fifen's identification of defendant. Defendant argues that Butler's recantation critically undercuts the reliability of Fifen's identification and would probably lead to a different result at retrial.

¶ 24    The State responds that Butler's recantation is not conclusive evidence of defendant's actual innocence where it only rebuts her testimony that she saw him enter the cab. The State argues that Butler does not allege that defendant was not in the cab or that he was not at her house when the cab was called. The State asserts that Fifen's identification of defendant alone was reliable, and although Butler's testimony bolstered the identification, it was not necessary for the guilty finding.

¶ 25    We review the circuit court's dismissal of a postconviction petition without an evidentiary hearing *de novo*. *People v. Sanders*, 2016 IL 118123, ¶ 31 (citing *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998)). The Act provides a process whereby a prisoner can file a petition asserting that his conviction was the result of a substantial denial of his constitutional rights. 725 ILCS 5/122-1 (West 2012); *People v. Robinson*, 2020 IL 123849, ¶ 42. On appeal from the second-stage dismissal of a postconviction petition, the question is whether the allegations in the petition and any supporting documentation, liberally construed in favor of the defendant and taken as true, are sufficient to invoke relief under the Act. *Sanders*, 2016 IL 118123, ¶ 31. For purposes of the State's motion to dismiss, all well-pleaded factual allegations that are not positively rebutted by the trial record must be taken as true. *Id.* ¶ 42.

¶ 26    When a defendant raises a claim of actual innocence, an evidentiary hearing is warranted only where the petition demonstrates a substantial showing of actual innocence. *Id.* ¶ 37. "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Robinson*, 2020 IL 123849, ¶ 47. Newly discovered evidence is that which was discovered after trial and could not have been discovered by the defendant earlier through

due diligence. *Id.* Evidence is material when it is relevant and probative of the defendant's innocence. *Id.* Evidence is noncumulative when it adds to the information heard by the fact finder at trial. *Id.* Finally, evidence is considered to have conclusive character if, when considered together with the trial evidence, it would probably lead to a different result. *Id.*

¶ 27    "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.* The ultimate question is whether the new evidence supporting the postconviction petition places the trial evidence in a new light and undermines the court's confidence in the guilty finding. *Id.* ¶ 48. It is not necessary that new evidence be completely dispositive of an issue to be likely to change the result on retrial. *Id.* Probability, not certainty, is the key when determining whether the fact finder would reach a different result when considering the trial evidence and new evidence together. *Id.*

¶ 28    Recanted testimony is considered inherently unreliable and a court will not grant a new trial on that basis unless there are extraordinary circumstances. *Sanders*, 2016 IL 118123, ¶ 33. However, when the State moves to dismiss a petition during the second stage of postconviction proceedings, the credibility of recanted testimony is not considered because all well-pleaded facts must be taken as true. *Id.*

¶ 29    Here, even if we presume that Butler's affidavits constitute newly discovered evidence, taking her assertions therein as true, we find that they do not support a claim of actual innocence. At trial, Butler testified that on the night of the shooting, defendant was at her house and she observed him enter the white cab with two other young men. In her first affidavit dated April 16, 2013, Butler stated that when the cab driver asked if anyone had called for a cab, she answered "yes" because she overheard defendant's two friends, whose names she did not know, say that

they were going home. Butler stated that she did not see where the young men went when the cab arrived. Butler further averred that her mother told her to tell the police "that I saw them all get into the cab. But I really didn't. I had already closed the door." In her second affidavit dated June 29, 2016, Butler again confirmed that she told the cab driver that someone at her house had called for a cab, but she did not know the names of the young men who did so. Butler averred "I did not see who got in the cab because I had already closed the door." She further stated, "At the time I did not see Rasheem Jackson although he is often at my house."

¶ 30   Butler's affidavits merely contradict her testimony that she observed defendant enter the cab with two other young men. She did not see who entered the cab because she had closed the door. In other words, Butler did not know whether or not defendant entered the cab. Her affidavits do not provide any evidence that defendant did not enter the cab. Taking her statements as true, it is still possible that defendant entered the cab with the two young men, and Butler merely did not see them.

¶ 31   Moreover, Butler's statement that she did not see defendant "at the time" is vague and is not evidence that he was not, in fact, at her house and did not enter the cab. Butler testified at trial that there were more than 12 people at her house that night, only 3 were women, and she was standing on her front porch with one of her cousins while the rest of her cousins and their friends were in her basement. She also testified that defendant arrived at her house at 8 a.m. that day and remained there the entire day. Butler's statement could mean that she did not see defendant because he was in the basement while she was on the porch, or again, that she did not see him enter the cab because she closed the door.

¶ 32    The record shows that Fifen testified that defendant was one of the three men who entered his cab. Defendant sat in the middle of the other two men in the back seat, he was not wearing a hat or glasses, and he did not have any facial hair. In the alley, there was artificial lighting from the expressway. Defendant stood three to four feet from Fifen and pointed a gun at him while the other men searched the cab. Fifen estimated that he looked at defendant with the gun for two to three minutes. Fifen testified that as he drove away, defendant fired two to three gunshots at him, striking him in the face. Fifen identified defendant in a photo array, a lineup, and in court. Killeen testified that when he showed Fifen the second photo array, Fifen "immediately" identified defendant as the man who shot him. The trial court found Fifen's identification of defendant as the shooter credible.

¶ 33    Based on this record, when Butler's affidavits are considered together with the trial evidence, we cannot find that her recantation is of such conclusive character that it would probably lead to a different result at retrial. *Robinson*, 2020 IL 123849, ¶¶ 47-48. Her recantation does not remove defendant from the cab, nor does it provide any evidence that defendant was not the gunman who shot Fifen. Accordingly, defendant's postconviction petition failed to make a substantial showing of actual innocence, and an evidentiary hearing was not warranted. *Sanders*, 2016 IL 118123, ¶ 37. We therefore conclude that the circuit court's order granting the State's motion to dismiss defendant's petition during second-stage proceedings was proper.

¶ 34    For these reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 35    Affirmed.