2022 IL App (1st) 1200161-U
Order filed May 9, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE FOR THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 09 CR 21812(02) |
| v. | ) | |
| | ) | |
| BERLY VALLADARES, | ) | The Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |
| | ) | |

PRESIDING JUSTICE HYMAN delivered the judgment of the court.
Justices Lampkin and Walker concurred in the judgment.

**ORDER**

¶1    *Held*: Circuit court judgment denying defendant leave to file a successive post-conviction petition affirmed where the trial court complied with our mandate on remand and defendant's petition failed to make a colorable claim of actual innocence sufficient to warrant further proceedings under the Post-Conviction Hearing Act.

¶2    A jury found Berly Valladares guilty of first degree murder and aggravated battery with a firearm on a theory that he provided a gun to his co-defendant, Narcisco Gatica. At a party, Gatica shot and killed Francisco Valencia and wounded Daisy Camacho. We affirmed Valladares's conviction and sentence on direct appeal. *People v. Valladares*, 2013 IL App (1st) 112010

(*Valladares I*). Valladares has since mounted collateral attacks on his conviction. First, he filed a post-conviction petition, which the trial court dismissed; we affirmed. *People v. Valladares*, 2016 IL App (1st) 142721-U (*Valladares II*). Then, he filed a pair of successive post-conviction petitions. The trial court denied leave to file one of the successive petitions—which is not the subject of this appeal—and we affirmed because Valladares failed to satisfy the cause-and-prejudice test for filing successive petitions. *People v. Valladares*, 2019 IL App (1st) 163010-U (*Valladares III*).

¶3     In his other successive post-conviction petition, Valladares raised a claim of actual innocence, referring extensively to a detective's report and arguing it shows he neither intended nor shared Gatica's intent to use the gun to shoot someone. Valladares appealed, but after discovering the trial court had not ruled on his claim of actual innocence, the parties agreed to summarily remand for a ruling. We agreed and remanded "for further proceedings to allow the Circuit Court to enter a ruling as to the *** request for leave to file a successive post-conviction petition claiming actual innocence." The trial court then denied leave to file the petition.

¶4     Before us, Valladares argues the trial court erred both by misapplying our mandate and rejecting his merits claim. We disagree. The text of our order remanding for further proceedings refers to Valladares's claim of "actual innocence" to identify the relevant pleading on which the court had to rule. Thus, the trial court could look to the substance (as opposed to the title) and determine whether it stated a claim of actual innocence. On the merits, the evidence Valladares refers to, even if newly discovered, would not satisfy the test of being so conclusive that it would probably change the result on retrial. We affirm.

¶ 5                                     Background

¶ 6     We detailed the facts of Valladares's offense in our opinion disposing of his direct appeal. *Valladares I*, 2013 IL App (1st) 112010, ¶¶ 5-30. At trial, the State argued Valladares was accountable for the actions of his co-defendant Narcisco Gatica. Trial evidence, including Valladares's testimony, showed he gave Gatica a gun. Gatica, Valladares, and a few others, then went to a party where Gatica shot Francisco Valencia and Daisy Camacho. We briefly recount Valladares's trial testimony and his recorded statement to Detective Michael Landando to give context for Valladares's actual innocence claim. In all other respects, we rely on our previous accounting of the facts.

¶ 7     Detective Landando interviewed Valladares, and the State played portions of the interview for the jury. Valladares explained he was a member of the Maniac Latin Disciples street gang. On the night of the shooting, one of Valladares's fellow gang members, nicknamed "Mickey," asked him for a gun because someone had pushed Mickey at a party. Mickey told Valladares to "go get the stuff," referring to a gun. Valladares went to his house, where he "grabbed the pistol" and loaded it with seven or eight bullets. Though Valladares was unsure what Mickey wanted to do with the gun, he speculated Mickey may have intended to "do a hit or scare some[one]." Landando pressed Valladares further, and Valladares explained that the Maniac Latin Disciples were "getting into it with the Cobras," and Valladares assumed "one of them" had pushed Mickey at the party. Later in the interview, Valladares admitted he lied about whom he gave the gun. He clarified that "everything [he] just told [Landando] just take Mickey out of it" because he gave the gun directly to Gatica.

¶ 8     Valladares told Landando that he walked back to the party with the group. He believed "they were all aware of what was gonna happen," but he did not know himself. After further questioning

by Landando, Valladares admitted "it was a question of [a] matter of time" for someone to get shot. When they arrived, Valladares heard gunshots and people screaming. During his conversation with Landando, Valladares initially said he could not identify the shooter but eventually admitted he saw Gatica shoot the gun.

¶9     During Valladares's trial testimony, he explained his role in the Maniac Latin Disciples. He was "pressured" into the gang at age 12. By the time of the shooting, he was a "gun-holder," meaning when "any individual of the gang comes and [ask]s [him] for a gun [he] give[s] them a gun." Valladares had no discretion when handing over guns because, if he refused, he would be physically disciplined. On cross-examination, Valladares said he "ran" the neighborhood and agreed with the State's characterization that he was "the person the governor [of the unit of the gang] trust[ed] to tell every[one] else what to do." In other words, Valladares had authority over other gang members. Valladares also agreed that he had discretion over how much ammunition to put in a gun when another gang member asked for it.

¶10    Regarding the narrative of the night of the shooting, Valladares agreed with his statement to Landando "pretty much explain[ed] what happened that night." He acknowledged that he initially lied about giving the gun to Mickey because he "didn't want to be involved." Valladares confirmed he gave the gun to Gatica, but when counsel asked him if he knew of Gatica's plans for the gun, he said, "not at all." Gatica did not tell him why he wanted the gun, and no one else in the group said anything to Valladares indicating what Gatica planned. As far as Valladares was concerned, "if anybody like a rival gang member[ ] came by it might have been a possible shooting, other than that, it was no sign of anything happening."

¶11    On cross-examination, Valladares elaborated that his gang had guns for protection from rival gang members and would respond to affronts by other gangs by retaliating against them. The

State asked whether Valladares thought there might be a gang dispute whenever someone asks for a gun, and Valladares agreed. He also agreed that when the group went back to the party, he wore a hoodie to "cover [his] identity." The State walked Valladares through the portions of his recorded statement that mentioned Mickey, and Valladares acknowledged that each reference was a lie.

¶12     After hearing the evidence, the jury found Valladares guilty of first degree murder of Valencia and aggravated battery with a firearm for shooting Camacho. In addition, the jury found Valladares accountable for Gatica being armed during the commission of the murder.

¶13     Valladares appealed and, after we affirmed, made several efforts to secure post-conviction remedies. This appeal deals with the second of two successive post-conviction petitions: Valladares's petition "advancing a claim of actual innocence." Referring extensively to the detectives' supplemental case reports, Valladares argued "the State never proved that [he] entered into any form of an agreement with *** Gatica" and that he cannot have been accountable for Gatica's actions because "there was no *** knowledge, intent, or agreement on [his] part."

¶14     Before the trial court ruled on the actual innocence claim, Valladares mistakenly appealed. As a result, the parties agreed to summary remand. We ordered "further proceedings *** to enter a ruling as to the *** request for leave to file a successive post-conviction petition claiming actual innocence."

¶15     In a written order on remand, the trial court denied leave to file. The trial court began its analysis by setting out the cause-and-prejudice test in the Post-Conviction Hearing Act. 725 ILCS 5/122-1(f)(1)-(2) (West 2018). The court focused heavily on cause which requires "any objective factor, external to the defense, which impeded the petitioner's ability to raise a specific claim in the initial post-conviction proceeding." See *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002). The court found Valladares's claims "procedurally barred" because the reports he relied on were

5

available at trial, and efforts to argue counsel's ineffectiveness for failing to invoke the reports was *res judicata*.

¶16    On the merits, the trial court found Valladares improperly characterized his claim as an actual innocence claim. The court reasoned that Valladares's petition challenged the sufficiency of the evidence in disguise because he argued "he was unaware that Gatica would use the gun to kill someone at the party, thus he should not have been found guilty under an accountability theory." Alternatively, the trial court found Valladares's claim meritless using the factors for an actual innocence claim. Though the court relied on the now-defunct "total vindication" standard, it nonetheless concluded that the evidence in the reports was "merely cumulative of the testimony and arguments that [Valladares] made at trial." In sum, Valladares's allegations were "cumulative, unsupported, and conclusory."

¶17                                    Analysis

¶18    Valladares urges us to reverse the denial of leave to file his successive post-conviction petition on several related grounds. He maintains that the trial court failed to comply with our mandate in several ways: (i) by recharacterizing his claim of actual innocence as a challenge to the sufficiency of the evidence, (ii) by applying the cause-and-prejudice test, which does not apply to claims of actual innocence, and (iii) by relying on the "total vindication" standard for assessing actual innocence claims, which our supreme court has now expressly rejected. These arguments are red herrings because, as we will explain, we review *de novo* the trial court's denial of leave to file a successive post-conviction petition alleging actual innocence. Accordingly, the particulars of the trial court's reasoning have little bearing on our review. Valladares then argues his actual innocence claim should go forward when viewed under the appropriate legal framework.

¶19    The State defends the trial court's judgment on the merits, arguing: (i) Valladares's actual innocence claim is *res judicata* because it amounts to a challenge to the sufficiency of the evidence, and (ii) the police reports on which Valladares relies were cumulative of the trial evidence, rather than newly discovered, and would not have probably changed the result at a new trial.

¶20    We affirm finding no error in the trial court's compliance with our mandate or its judgment on the merits of the petition.

¶21                                        Mandate

¶22    Valladares argues the trial court failed to comply with our mandate by using the cause-and-prejudice test to analyze his claim of actual innocence. To resolve this issue, we consider three questions: (i) what did our mandate say? (ii) what did the trial court do? and (iii) does the trial court's decision fulfill our mandate? In short, our mandate instructed the trial court to rule on the only successive post-conviction petition pending—a petition raising a claim of actual innocence. On remand, the trial court ruled on that petition by first finding that Valladares's claim was not a cognizable claim of actual innocence, and secondly, by assuming a claim of actual innocence and rejecting it on the merits. The trial court's actions, therefore, match the instructions in our mandate. We find no procedural error.

¶23    A court receiving a reviewing court's mandate "is under a positive duty to enter an order *** in accordance with the directions contained in the mandate." *Ertl v. City of De Kalb*, 2013 IL App (2d) 110199, ¶ 21. If the court receiving the mandate fails to follow it, we will reverse. *Id.*

¶24    Our mandate stated: "the cause is remanded to the Circuit Court of Cook County for further proceedings to allow the Circuit Court to enter a ruling as to the January 5, 2016 request for leave to file a successive post-conviction petition claiming actual innocence." Valladares argues this language had a substantive component, limiting the scope of the trial court's consideration of his

7

petition on remand. But the natural reading of our order construes the words "petition claiming actual innocence" as language of identification. This particular petition was one of four post-conviction petitions Valladares had filed and, though we had ruled on all the others by the time of the remand, we had to identify the relevant petition with specificity. Valladares does not dispute that the trial court, on remand, considered and ruled on his "petition claiming actual innocence." And, because that is all our order said, the trial court complied with the mandate.

¶25    In reality, most of Valladares's claims about the trial court's failure to follow our mandate constitute claims that the trial court committed substantive error when it ruled on his petition. He asserts the trial court improperly recharacterized his claim of actual innocence as a challenge to the sufficiency of the evidence. Relatedly, Valladares asserts the court improperly applied the cause-and-prejudice test based on its recharacterization of his claim. The State defends the trial court's reasoning on this ground, arguing *res judicata* because the claim is indistinguishable from a claim attacking the sufficiency of the evidence.

¶26    We decline to address these arguments. Error in the trial court's analysis is irrelevant because we review judgments, not reasoning. *City of Chicago v. Holland*, 206 Ill. 2d 480, 491-92 (2003) ("The reasons given by a lower court for its decision or the findings on which a decision is based are not material if the judgment is correct."). This principle has greater application here as we review *de novo* the trial court's denial of leave to file a successive post-conviction petition. *People v. Robinson*, 2020 IL 123849, ¶ 40. Our standard of review, in conjunction with our role as a reviewing court, means we need not frame our analysis the same way the trial court did. See *People v. Johnson*, 2021 IL 125738, ¶ 28 (no deference to post-conviction court's "judgment or reasoning"). We proceed, instead, to the merits of the actual innocence claim.

8

¶27                                    Actual Innocence Claim

¶28     Generally, the Post-Conviction Hearing Act contemplates filing a single petition. *People v. Robinson*, 2020 IL 123849, ¶ 42. This bar on successive petitions is relaxed in two circumstances: (i) where the petitioner can show cause for and prejudice from failing to raise a claim in a previous post-conviction petition, or (ii) where the petitioner "asserts a fundamental miscarriage of justice based on actual innocence." *Id.* Regarding claims of actual innocence, the trial court should allow the filing of the petition where it raises a "colorable claim," taking the well-pled allegations in the *pro se* petition as true and eschewing all factual and credibility determinations for later stages. *Id.*, ¶ 45. To warrant further proceedings, the petition must make a colorable showing that the evidence supporting the actual innocence claim is "(i) newly discovered, (ii) material and noncumulative, and (iii) of such a conclusive character that it would probably change the result on retrial." *Id.*, ¶ 47. The evidence need not lead to "total vindication or exoneration" but "place[ ] the trial evidence in a different light that undermines the court's confidence in the judgment of guilt." *Id.* ¶¶ 55-56.

¶29     At oral argument, Valladares's counsel reminded us that he need not prove his claim at this stage. We agree. But he must still make a "colorable showing" as to all three elements of his actual innocence claim. This showing falls between the "arguable" standard for the first stage of initial post-conviction petitions and the "substantial showing" standard applied at the second stage of post-conviction proceedings. *Id.* ¶ 43.

¶30     Valladares contends that the detectives' report qualifies as "newly discovered," even though his counsel had the report and attached it to his motion for a new trial. According to Valladares, he never saw the report because he did not have access to his discovery.

¶31   Evidence is newly discovered when: (i) the petitioner discovers the evidence after trial, and (ii) the petitioner could not have discovered the evidence earlier through due diligence. *Id.* ¶ 53. The State points to an isolated statement in Valladares's petition arguing that he knew of the evidence all along: "This evidence [the reports] were there all the time." The State omits, however, Valladares's later allegation that "these reports and statements were in [his counsel's] absolute control and possession." The question before us is whether counsel's knowledge of the relevant evidence stands in for Valladares's personal knowledge of the same evidence.

¶32   Valladares does not provide citation to a case that definitively answers this question, and the law appears unclear. For example, we have suggested that counsel's possession of the evidence is sufficient to conclude that the petitioner knew of the evidence; we also rejected a claim that counsel's alleged ineffectiveness was sufficient to excuse the petitioner's failure to raise the evidence in an earlier proceeding. See *People v. Smith*, 341 Ill. App. 3d 530, 540 (2003). Valladares relies on language in *Robinson*, however, suggesting the opposite conclusion. See *Robinson*, 2020 IL 123849, ¶ 53 (focusing on whether "petitioner" could have discovered the evidence sooner, whether it was "known *to him*," and distinguishing petitioner's knowledge of evidence and communication of existence of evidence to trial counsel) (emphasis added).

¶33   We need not wade further into this murky area of law. We will take Valladares's claim that his counsel kept the reports from him as true. So, we assume without deciding that the detectives' report was newly discovered.

¶34   Our review of the reports shows that some of the evidence would have been noncumulative. See *id.* ¶ 47 (defining noncumulative as "evidence [that] adds to the information that the fact finder heard at trial."). Most of the witnesses in Landando's report did not testify at trial, and several provide details missing from Valladares's testimony or his statements to police. We will give

Valladares the benefit of the low pleading bar at the leave to file stage and find the evidence in the detectives' report is noncumulative.

¶35 Valladares's claim flounders, however, when we analyze the materiality of the evidence in the detectives' report. To be material, evidence must be "relevant and probative of the petitioner's innocence." *Id.* We agree that the testimony of the witnesses identified in Landando's report could provide relevant evidence—they would likely have to admit that they did not know what Valladares knew when he gave the gun to Gatica. But the same theory making their statements relevant defeats the probative value of their potential testimony.

¶36 Based on Jorge Contreras's statement to Landando, he was not present when Valladares gave the gun to Gatica. Contreras was loitering behind the party with other members of the group and later saw Gatica return to the party with Valladares. Contreras would be similarly unable to testify about Gatica's and Valladares's actions after the shooting because he ran in a different direction. Contreras's brother, Eliezer, gave a substantially similar statement. Like the brothers Contreras, Jovanny Carrera was not present for the gun exchange and was with the group loitering near the party until he saw Gatica and Valladares return together. Rafael Martinez (Smiley) was with Gatica when the group initially got kicked out of the party, but he hung out with Contreras and Carrera when Gatica left. Martinez makes no mention of Valladares in his statement, and he too ran in a different direction than Gatica after the shooting. So, while none of these witnesses could testify to what Valladares knew at the time of the shooting, none were in any position to gain that knowledge either before or after the shooting.

¶37 Osvaldo Salgado was the only witness at the gun exchange, according to the report. After getting kicked out of the party, Gatica told Salgado that "he was going to get the gun from Valladares and scare people at the party." When Salgado and Gatica arrived at Valladares's house,

Valladares handed Gatica a gun, and the group walked back to the party. So, Salgado knew that Gatica wanted to "scare the people at the party," but his statement reveals nothing about what Valladares knew or could have known when he handed over the gun.

¶38 At a possible retrial, each of these witnesses would testify (if they remained consistent) that they did not know whether Valladares shared Gatica's intent or his criminal design at the time of the shooting. But their testimony would not be probative; none of them were in a position to gain that knowledge—not even Salgado, who was present for the gun exchange but gave no indication about any words or actions of intent (beyond the gun transfer) shared between Valladares and Gatica.

¶39 For similar reasons, evidence in the report is not of such a conclusive character that it would probably change the result on retrial. This factor is "the most important element of an actual innocence claim." *Id.* ¶ 47. None of the witness statements we described conflict with Valladares's trial testimony or Landando's recounting of Valladares's statement to police. For example, five witnesses saw the shooting, including Salgado, Martinez, Carrera, Eliezer Contreras, and Jorge Contreras, and all confirmed Gatica was the shooter. Indeed, only Gatica's statement to the detectives denied he was the shooter, and he singled out Valladares. At least one statement, Salgado's, confirmed that Valladares gave the gun to Gatica and went with Gatica back to the house party. None of the witness statements cast doubt on the narrative of the offense, much of which came from Valladares's statement and testimony.

¶40 Mostly, Valladares's briefs argue against particulars of the trial court's analysis. Moreover, despite recognizing that we review the trial court's decision *de novo*, he hardly argues that his petition makes a colorable showing of the three prongs of an actual innocence claim. Finally, even if the trial court's analysis isn't correct in every detail, we have carefully reviewed Valladares's

petition and the reports on which it relies and finds no new information casting the trial evidence in a different light.

¶41    Valladares has failed to make a colorable claim of actual innocence.

¶42    Affirmed.